## �export𝔯𝔦𝔠𝔥𝔪𝔬𝔫𝔡

### HENRY HART V. COMMONWEALTH.

#### November 17, 1921.

1. VENUE—*Sufficiency of Proof of Venue.*—Where the only reasonable inference which could be drawn from the evidence was that the place of the crime was west of, outside, and less than one-half mile from the corporate limits of the city of Staunton, it is sufficiently established that the crime was committed in the county of Augusta.

2. JUDICIAL NOTICE—*Geographical Facts—Location and Boundaries of Political Subdivisions of the State.*—The location and boundaries of the county of Augusta and of the city of Staunton are designated in the legislation and referred to in the general laws of the State; and, moreover, it is a geographical fact, shown by any map in common use, and thus a matter of common knowledge, that the city of Staunton is located within the county of Augusta, and is so located therein that the county of Augusta surrounds, and, beyond all question, extends for a distance of over fifteen miles to the west of, the corporate limits of the city. The court will therefore take judicial notice of that fact.

3. JUDICIAL NOTICE—*Distances.*—While there are decisions to the effect that courts will not take judicial notice of the distance between places in the same county, nor the local situation and distances in a county, nor that the boundary of a city or county is located at a given spot, these holdings have reference to places which are not incorporated, or located by general legislation, and which do not appear on maps in common use, and therefore have merely a local notoriety, or to places so near the boundary lines as to leave the matter in doubt. The courts will take notice of distances as calculated by a map between places which are incorporated or located by general legislation, or which appear on maps in common use.

4. VENUE—*Evidence of Venue—Calling Police.*—While the calling of the police of a city is a circumstance tending to show that the crime was committed within the jurisdiction of the police, in the instant case the circumstance that the police of the city of Staunton were called upon to make the arrest was of no

probative value upon the issue of venue since it was equally consistent with the conclusion that the crime was committed outside of and within one mile of the corporate limits of the city of Staunton, as with the conclusion that it was committed within such corporate limits.

5. CONSTITUTIONAL LAW—*Cruel and Unusual Punishment—Death for Attempt to Commit Rape.*—The punishment of death for the crime of attempt to commit rape is not contrary to the fourteenth amendment of the federal constitution, or to section 9 of the Constitution of Virginia, which forbids cruel and unusual punishments.

6. CONSTITUTIONAL LAW—*Cruel and Unusual Punishment—Death for Attempt to Commit Rape—Discretion of Jury as to Punishment.*—Code of 1919, section 4767, is not unconstitutional as authorizing cruel and unusual punishment, in that it empowers juries in their discretion to impose the punishment of death for the attempt to commit rape.

7. CONSTITUTIONAL LAW—*Cruel and Unusual Punishment—Limitation Upon Mode or Quantum of Punishments.*—It has been uniformly held by the Supreme Court of Appeals that the provisions in section 9 of the Constitution, which have remained the same as they were originally adopted in the Virginia Bill of Rights of 1776, must be construed to impose no limitation upon the legislative right to determine and prescribe by statute the quantum of punishments deemed adequate by the legislature; that the only limitation so imposed is upon the mode of punishments, such punishments only being prohibited by such constitutional provision as were regarded as cruel and unusual when such provision of the Constitution was adopted in 1776, namely, such bodily punishments as involve torture or lingering death—such as are inhumane and barbarous—as, for example, punishment by the rack, by drawing and quartering, leaving the body hung in chains, or on the gibbet, exposed to public view.

8. CONSTITUTIONAL LAW—*Cruel and Unusual Punishment—Electrocution.*—The punishment of death by electrocution (which is the present mode of inflicting the death penalty in Virginia), as is well settled, cannot in itself be regarded as a cruel or unusual mode of punishment.

9. CONSTITUTIONAL LAW—*Cruel and Unusual Punishment—Limitation Upon Mode or Quantum of Punishments—Question Open in Virginia.*—The question of whether the provision of the Constitution as to cruel and unusual punishment imposes a limitation upon the legislative right, not only to determine and prescribe the mode of punishments, but also upon the quantum of punishments, is still an open one in Virginia. There is great

force in the view that a statute might be enacted prescribing a punishment in quantum so severe for a comparatively trivial offense that it would be so out of proportion to the crime as to shock the conscience; and such statute might possibly be held in conflict with section 9 of the Constitution, although the mode of punishment was not unusual.

10. CONSTITUTIONAL LAW—*Cruel and Unusual Punishment—Quantum and Mode of Punishment—Death Penalty for Attempted Rape.*—Without determining the general question of whether the constitutional provision against cruel and unusual punishments does or does not impose a limitation upon the legislative power of prescribing the quantum of punishments for crimes, yet section 4767 of the Code of 1919 is not unconstitutional as violative of that constitutional provision, and the punishment imposed upon the accused in the instant case, in accordance with the authority of that statute, was a lawful punishment, and cannot be disturbed as prohibited by the Constitution.

11. CRIMINAL LAW—*Reasonable Opportunity of Accused to Employ Counsel—Case at Bar.*—In the instant case no motion was made for a continuance. The first trial resulted in a hung jury. The second trial occurred two days after the beginning of the first trial, and the same counsel assigned by the court then represented the accused as on the first trial.

*Held:* There was nothing in the record indicating that the accused was not given reasonable opportunity to employ counsel and prepare for trial.

12. NEW TRIALS—*Verdict Contrary to the Evidence—Case at Bar.*— In the instant case the mode of attack and the manner in which force was exerted, unaccompanied by any explanation or indication in the facts certified tending to show any other motive, was sufficient to warrant the jury in finding that the accused intended the natural result as indicated by his conduct, namely, the rape of the prosecutrix, and was only prevented from accomplishing his purpose by extraneous reasons. Moreover, the accused admitted that the assault was made with that intent.

*Held:* That upon these facts and the other evidence, the jury were warranted in finding accused guilty of attempt to rape.

Error to a judgment of the Circuit Court of Augusta county.

*Affirmed.*

In this case the accused was indicted in Augusta county on December 9, 1920, upon the charge of rape committed in that county upon the person of the prosecutrix, who was of the age of about seventeen years. . On the same day there was a trial by jury in said county, the accused being represented by counsel assigned by the court. The jury not having reached an agreement upon a verdict, the case was continued over to the next day, December 10th. On that day, it being found that the jury could not agree upon a verdict, by the consent of the accused and of the attorney for the Commonwealth, and with the assent of the court, one of the jurors was withdrawn, the other members of the jury were discharged, and a new trial was ordered. Thereupon, on the same day, other persons qualified to serve as jurors were ordered to be ascertained and summoned according to law to attend the court the next morning at ten o'clock, from whom a jury might be selected for the trial of the accused. On the next day, December 11th, the accused, being represented by the same counsel, was tried in said county before a jury duly constituted. That trial resulted in the verdict mentioned below.

The facts proven on the trial last mentioned are certified and such facts and all of the proceedings in court on such trial appear in the record before us as follows:

## "CERTIFICATE OF FACTS.

"Virginia Garber, at the time of the assault on her made by the defendant, Harry Hart, was about 17 years old. She was rather small for her age, and is a simple, good, unsophisticated country girl,. who lives with her mother about half a mile west from the corporate limits of the city of Staunton on what is known as the Buttermilk Spring road. At the time of the assault, which was on the 8th of December, 1920, she was working and had worked for some time at a laundry in Staunton, and was accustomed

to go to her work about six o'clock in the morning, and on the morning of the assault left at her accustomed hour, by her accustomed way, to go to work. Six o'clock at that season of the year, is in the early dawn of the day, about daybreak, the sun rises at 7:15. Harry Hart, her assailant, is a full-grown negro man, aged twenty-one years, married and lived with his wife and child in the same neighborhood in which Miss Garber lived, and was familiar with her customs and habits to the extent that he knew that she was in the habit of going along this road at this time to her work. The point in the road at which she was assaulted was a secluded one, shut off from the front by a sharp bend in the road, with a high bank on the left-hand side thereof coming to Staunton. Hart, on leaving home, took with him an old overskirt belonging to his wife, which he said was to be used by him to wipe up with at the infirmary at the Staunton Military Academy, where he worked, there having been a case of scarlet fever there, and slipped up behind Miss Garber and threw it over her head, and at the same time put his hand over her mouth to prevent any outcry. She struggled to the extent of her ability and freed herself sufficiently to cry out once for help, and sufficiently loud for her sister, who was on her home porch somewhere about 300 yards off, to hear her. She continued to struggle to escape from him to the best of her ability and until she was about exhausted. The soft ground over which they struggled showed that this struggle had been long and serious. While the struggle was going on, two young white men, Cressman and Southards, traveling westward on this road, walking, came suddenly around the sharp bend in it and saw this negro man and a woman struggling in the road. They recognized the fact that the man was a negro, but the light was dim at that hour and they did not recognize that the woman was a white woman. They saw that he had something over her face, either a cloth of some sort or his hand. These men thought that

this was a negro having some difficulty with his wife or woman and it was not their part to interfere, and they did not interefere.

"Miss Garber attempted to call out to them as they passed her in the road, within a few feet of her, but her voice was so muffled that she was unable to make herself heard, but these men, after they had gone a short distance along this road past the scene of the struggle, stopped about twenty or thirty feet from the accused and the woman. Hart looked back over his shoulder and saw that they had stopped and were observing him. He thereupon turned the girl loose. She saw the two white men, but did not then call to them except when they were passing her as aforesaid, but started to walk to the nearest house in that section that was lighted and showing any signs of life, 414 yards away, went to it and called when she arrived, and, to throw off suspicion on the part of Hart, said that she had a letter for its owner, a Mrs. Smith. When she got into the house, she immediately told of the assault, remained there until it was light enough to return to her home, when she restated to her mother her experience. Her mother, in the shortest possible time, laid the facts before the police of Staunton. After Hart had turned her loose, and after she had started for this house, he followed, they talking together as they went, and he said he would walk a little distance behind in order that anybody who saw them might not "think any-thing." Hart threw the overskirt in a ditch by the roadside a short distance from the point of the assault, and said that his reason for so doing was that he was frightened at what he had done.

"During the attack and towards the close of it, about the time that Cressman and Southards stopped, Hart took his hand from Miss Garber's mouth, but told her not to make any outcry. She then said to him that she was a good Christian girl and wanted to continue to be one. To which he replied that she was the first Christian girl he had ever

seen and he would not harm her if she was a Christian girl, but he did not turn her loose, as has been stated before, until he saw that Cressman and Southards, who had passed him, had stopped in the road and were looking back to see what was going on.

"After the matter had been reported to the police, they took up the trail and in a short time arrested Hart, who was working at the Staunton Military Academy. He was questioned and gave an account of himself and of his movements which seemed to be satisfactory, and as the girl could not identify him, he was turned loose and returned to the Staunton Military Academy. His account of himself was, in the meantime, investigated and found to be false, and in a short time he was rearrested and, upon being questioned, admitted that he was the man they were looking for.

"At the first trial, Hart testified in his own behalf and there was a hung jury. At the second trial, he testified in his own behalf also, and said that while he had assaulted Miss Garber, it was not his intention to push that assault to its ultimate conclusion, but it was then shown that, under cross-examination, at his first trial he had admitted not only the assault on Miss Garber, but that he had intended when he made this assault upon her to rape her.

"Soon after Hart was arrested his underclothes which he had on at the time of the assault were examined and there was found thereon stains of seminal fluid that seemed to be fresh.

"Miss Garber was not injured or bruised or thrown down, nor were her clothes torn. Hart did not put his hands under her clothes, nor use any vulgar language, or make to her any improper proposal. When he relaxed his efforts to consummate the assault, he kissed her. The evidence of those who knew him more or less casually was that he bore a good reputation as a law-abiding citizen before this trouble arose."

The foregoing were all of the facts that were proven, and thereupon the court instructed the jury as follows:

"The court instructs the jury that an attempt in criminal law is an apparent unfinished crime, and hence is compounded of two elements, viz:    (1)   The intent to commit the crime, and (2) a direct act done towards its commission, but falling short of the execution of the ultimate design.   It need not, therefore, be the last proximate act to the consummation of the crime in contemplation, but is sufficient, if it be an act apparently adapted to produce the result intended."

"The court instructs the jury that if they believe from the evidence beyond a reasonable doubt that the accused, with purpose and intent of committing a rape upon the prosecuting witness, Miss Garber, committed an overt act toward the accomplishment of such purpose which was of such a character apparently adapted to produce the result intended, then they should find the accused guilty of an attempt to commit rape, even though they may further believe that he subsequently voluntarily abandoned his purpose and did no further act towards its accomplishment."

The court also, at the request of counsel for the prisoner, gave sundry instructions on his behalf, but these do not appear in the record on the appeal.

After the jury had heard all of the evidence and had received the said instructions of the court and had heard the argument of counsel, and before they retired from the jury box, the court charged them orally from the bench as follows:

"Gentlemen of the jury, you will now retire to the jury room to consult over a verdict, and after you have retired, consider all of the evidence in the case carefully, and if, after a careful and painstaking consideration of all of the evidence in the case, you should believe that the defendant is not guilty, then say so and no more; but, if you should believe from the evidence beyond a reasonable doubt that

the defendant is guilty of attempt to commit rape, as charged in the indictment, then you will find him guilty, and fix his punishment at death, or, in your discretion, by confinement in the penitentiary not less than three nor more than eighteen years."

Thereupon, the jury retired to the jury room to consult, and in a short time returned to the court and delivered the following verdict:

"We the jury find the accused, Harry Hart, guilty of attempted rape, under the within indictment, and ascertain and fix his punishment at death."

Thereupon, the defendant, by counsel, moved the court to set aside the verdict of the jury and to grant him a new trial, on the ground that the verdict was contrary to the law and to the evidence, but the court forthwith overruled the motion of the defendant, and rendered judgment against the defendant upon the said verdict, to which action of the court the defendant thereupon excepted.

*Carter Braxton* and *Curry & Curry,* for the plaintiff in error.

*John R. Saunders, Attorney-General; J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The assignments of error raise the questions which will be disposed of in their order as stated below.

[1] 1. Did the Commonwealth prove the venue—that is, that the crime was committed in the county of Augusta?

This question must be answered in the affirmative.

It is true that it is not expressly proved that the place at which the crime was committed was in the county of Augusta; but it is expressly proved that the prosecutrix lived

about half a mile west from the corporate limits of the city of Staunton, on a certain road; that she was on her way, going along said road from her home toward her place of work in said city when she was assaulted; and that the point in the road at which she was assaulted was on the side of the road "coming to Staunton." It is further expressly proved that the cry of the prosecutrix for help, given while she was being assaulted, was "sufficiently loud for her sister, who was on her home porch, somewhere about 300 yards off, to hear her." The language of this statement of facts is, it is true, in itself obscure, since it is possible that the "home porch" referred to as being "about 300 yards off" may have been the home porch of the sister and a different place from that of the home of the prosecutrix. But in view of the context, in which no home of the sister is elsewhere mentioned, but the home of the prosecutrix is elsewhere therein expressly mentioned, the most natural and reasonable construction to be given to the language last quoted is that it refers to the home of the prosecutrix. This construction, as will also be observed, would give to the pronoun "her" the same meaning with that in which it is certainly first and last used in the phrase in question. This would locate the offense as having been committed about 300 yards east of the home of the prosecutrix, which would be about that distance less than approximately a half mile west of the corporate limits of Staunton and would accord with the other proved facts.

The only reasonable inference which can be drawn from these facts is that the place of the crime was west of, outside of, and less than one half mile from the corporate limits of the city of Staunton.

[2] The location and boundaries of the county of Augusta and of the city of Staunton are designated in the legislation and referred to in the general laws of the State; and, moreover, it is a geographical fact, shown by any map in

common use, and thus a matter of common knowledge, that the city of Staunton is located within the county of Augusta, and is so located therein that the county of Augusta surrounds, and, beyond all question, extends for a distance of over fifteen miles to the west of the corporate limits of the city of Staunton. The court will, therefore, take judicial notice of that fact. *McNeel* v. *Herold,* 52 Va. (11 Gratt.) 309, 315-16; 17 Am. & Eng. Ency. Law, p. 906; Wharton on Law of Ev., sec. 335, 339; *The Indianapolis & Cincinnati R. Co.* v. *Stephens,* 28 Ind. 429; *Indianapolis & Cincinnati R. Co.* v. *Case,* 15 Ind. 42; *Hinckley* v. *Beckwith,* 23 Wis. 328; *Central, etc., Co.* v. *Gamble,* 77 Ga. 584, 587, 3 S. E. 287; *Winnipiseogee Lake Co.* v. *Young,* 40 N. H. 420; *Wright* v. *Hawkins,* 28 Tex. 452; *Ham* v. *Ham,* 39 Me. 263; *United States* v. *La Vengeance,* 3 Dall. 297, 1 L. Ed. 610; *Peyroux* v. *Howard,* 7 Pet. 342, 8 L. Ed. 700; *United States* v. *Johnson,* 2 Sawy. 482, Fed. Cas. No. 15, 488; *R.* v. *Maurice,* 16 Q. B. (A. & E.) 906; *Beebe* v. *United States,* 2 Dak. 292, 11 N. W. 505; *State* v. *Arthur,* 129 Iowa 235, 105 N. W. 422; *State* v. *Southern Ry. Co.,* 141 N. C. 846, 54 S. E. 294; *State* v. *Wabash Paper Co.,* 21 Ind. App. 167, 48 N. E. 653, 51 N. E. 949.

As said in *McNeel* v. *Herold, supra,* 52 Va. (11 Gratt.) 309: "The objects sometimes called for are so connected with the general history or geography of the country, or its legislation, that they will be taken notice of by the courts and deemed of general notoriety and sufficiently identified without further proof. * * * In other cases, the objects called for possess but a local notoriety or furnish a description * * which must be verified and applied by means of facts to be ascertained on the spot * * ."

As said in 17 Am. & Eng. Ency. Law, supra, (p. 906): "It has been held that courts will take judicial notice of the geographical position of the towns within their jurisdiction, but not as to foreign towns and cities. To this latter rule, however, there have been adjudged exceptions."

As said in Whart. on Law of Evidence, sec. 339: "A court is bound to take judicial knowledge of the leading geographical features of the land * * * the courts of a particular State know the boundaries of the State and its divisions into towns and counties and the limits of such divisions. * * The positions of leading cities and villages in such States * * ."

[3] As is also said in the learned work last cited, section 335, *supra:* "So the courts will take notice * * * of distances as calculated by a map."

In *Indianapolis & Cincinnati R. Co.* v. *Case, supra* (15 Ind. 42), the plaintiff sued in Shelby county for the value of an animal alleged to have been killed by the railroad company in that county. The statute required the action to be brought in the county in which the animal was killed. The defendant railroad company raised the question of the jurisdiction of the court on the ground that the plaintiff failed to prove that the injury was committed in Shelby county. In the opinion of the Supreme Court this is held and said: "No witness stated that the animal was killed in that county; yet several stated that it was killed on the railroad between two geographical points, which we will judicially know are in that county."

In *Indianapolis & Cincinnati R. Co.* v. *Stephens, supra* (28 Ind. 431), the action was brought in Boone county for the killing of a horse in that county. The proof was "that the horse was killed about half a mile northwest of Hazelrigg station." Held: That the court would take judicial knowledge of the geographical position of that station and that the place in which the horse was killed, about a mile and a half west of it, was in Boone county.

In *Hinckley* v. *Beckwith,* 23 Wis. 328, the law was that the depositions of certain witnesses could not be read at the trial if they did not live more than thirty miles from the place of the trial. The place of trial was in Waupaca

47

county. It appeared from the depositions that one of the witnesses resided at Necedah, in Juneau county, and the other in Leola, in Adams county. The court said: "The place of residence of each witness is stated in his deposition; and the court taking notice of the geographical divisions of the State must know that they resided more than * * (thirty miles) * * from the place of trial."

In *Central, etc., Co.* v. *Gamble, supra* (77 Ga. 584, 3 S. E. 287), the court said: "The declaration alleges that the injury complained of was done in the county of Talbot, and while the proof upon this question is not direct, yet it establishes that it occurred between two points—Bostic and Geneva—both located on the line of the railroad in that county. At each of these points there are postoffices, and we have held that the court will take judicial notice of the fact that they are located in the county."

It is true that there are decisions to the effect that courts will not take judicial notice of the distance between places in the same county; nor of the local situation and distances in a county" (*Anderson's Case,* 100 Va. 864, 42 S. E. 865); nor that the boundary of a city or county is "located at a given spot" (Greenleaf on Ev. [16th ed.], sec. 6). But these holdings have reference to places which are not incorporated, or located by general legislation, and which do not appear on maps in common use, and therefore have merely a local notoriety, or to cases in which the location in question, as judicially known, from the legislation on the subject or from maps in common use, refers to a place so near the boundary line or lines in question as to leave the matter in doubt as to whether the location is within or outside of certain lines. In such case further specific evidence is needed to resolve the doubt. But in the instant case the geographical fact aforesaid, when considered in the light of the facts expressly proved, locate the locus of the crime so far within the boundary lines of the county, and outside

those of the city, as to leave no room for reasonable doubt on the subject.

Therefore, when the facts proved as aforesaid are considered along with the fact of which the court will take judicial notice, as aforesaid, it appears that the venue has been proved by the Commonwealth beyond any reasonable doubt.

[4] The circumstance that the police of the city of Staunton were called upon by the mother of the prosecutrix to arrest the accused, and that neither the sheriff of the county of Augusta, nor any one of his deputies, was called upon to make the arrest, is urged as circumstantial evidence that the crime was committed within the corporate limits of the city of Staunton; and *West's Case,* 125 Va. 747, 99 S. E. 654, is relied upon in argument for the accused on this subject. The conclusion drawn in the *West Case,* however, from the circumstance that the police of the city were called upon to make the arrest, was merely that it was one among a number of other circumstances which tended to show that the crime was committed within the jurisdiction of the police. But by statute the jurisdiction of the corporation courts of cities, and, hence, of the police of cities, extends one mile beyond the corporate limits. So that in the instant case the circumstance that the police of the city of Staunton were called upon to make the arrest could, at most, be considered only as a circumstance of no probative value upon the issue of fact under consideration, since it is equally consistent with the conclusion that the crime was committed outside of and within one mile of the corporate limits of the city of Staunton, as with the conclusion that it was committed within such corporate limits.

[5] 2. Was the punishment of death for the crime of an attempt to commit rape, under the facts of the instant case, contrary to the fourteenth amendment of the federal constitution, or to section 9 of the Constitution of Virginia (1776) which forbids cruel and unusual punishments?

This question must be answered in the negative.

That the punishment was not contrary to the fourteenth amendment, see *Collins* v. *Johnson*, 237 U. S. 502, 509-510, 35 Sup. Ct. 649, 59 L. Ed. 1071.

As said by the Supreme Court in the case last cited: "To establish appropriate penalties for the commission of crime and to confer upon judicial tribunals discretion respecting the punishment to be inflicted in particular cases, within limits fixed by the law-making power, are functions peculiarly belonging to the several States; and there is nothing to support the contention that the sentence imposed in this case" (fourteen years' imprisonment for perjury) "violates the provisions of the fourteenth amendment, either in depriving appellant of his liberty without due process of law, or in denying to him the equal protection of the laws." Citing Supreme Court cases.

[6] The punishment fixed by the verdict of the jury was within the limits prescribed by the statute, Code 1919, sec. 4767. The inquiry next to be considered, therefore, is the following: Is the statute unconstitutional because it authorizes cruel and unusual punishment in this, that it empowers juries in their discretion to impose the punishment of death for the attempt to commit rape?

The statute under consideration, so far as material, is as follows:

"Sec. 4767. * * * If the offense attempted be punishable with death, the person making the attempt shall be confined in the penitentiary not less than two nor more than five years, *except that attempts to commit rape shall be punishable with death, or, in the discretion of the jury, * * * by confinement in the penitentiary* not less than three nor more than eighteen years."

The italicized language was added to the statute by an act of assembly approved January 15, 1894 (Acts 1893-4, p. 29), amending and re-enacting section 3888 of the Code of 1887.

Section 3888 of the Code of 1887, so far as material, reads as follows: "If the offense attempted be punishable with death, the person making such attempt shall be confined in the penitentiary not less than two nor more than five years, except that in cases of attempt to commit rape, the term of confinement in the penitentiary shall be not less than three nor more than eighteen years."

. The present statute prescribing the punishment for rape upon a female at the age of fifteen years or more against her will provides that the person guilty of such crime "shall, in the discretion of the jury, be punished with death or confinement in the penitentiary not less than five nor more than twenty years." (Acts 1918, p. 139.) The age of consent has been changed from time to time, being the age of twelve under the Code of 1887, sec. 3680; made fourteen by Acts 1895-6, p. 673; sixteen by Code 1919, sec. 4414; and fifteen by Acts 1918, p. 139. Subject to these changes in the age of consent, the punishment for rape was not less than *ten* nor more than twenty years under the Code of 1887, sec. 3680, and was changed to not less than *five* nor more than twenty years by Acts 1895-6, p. 673, and has so remained since that time.

[7] It has been uniformly held by this court that the provisions in question in the Virginia Constitution, which have remained the same as they were originally adopted in the Virginia Bill of Rights of 1776, must be construed to impose no limitation upon the legislative right to determine and prescribe by statute the quantum of punishments deemed adequate by the legislature. That the only limitation so imposed is upon the mode of punishments, such punishments only being prohibited by such constitutional provision as were regarded as cruel and unusual when such provision of the Constitution was adopted in 1776, namely, such bodily punishments as involve torture or lingering death, such as are inhumane and barbarous, as for example, punishment by the rack, by drawing and quartering, leaving the body hung in chains, or on the gibbet, exposed to

public view, and the like. *Aldridge's Case,* 2 Va. Cas. 447, 449-450; *Wyatt's Case,* 6 Rand. (27 Va.) 694; *Bracey's Case,* 119 Va. 867, 872, 89 S. E. 144.

In *Aldridge's Case, supra* (2 Va. Cas. 449-450), the penalty imposed by the judgment of the trial court, on a "free person of color," for the crime of grand larceny, was that he be sold as a slave, transported and banished beyond the United States, and that he be given, in addition, thirty-nine stripes on his bare back. This punishment was authorized by the statute and the judgment was held to be valid. The court said: "As to the ninth section of the Bill of Rights, denouncing cruel and unusual punishments, we have no notion that it has any bearing on this case. That provision was never designed to control the legislative right to determine *ad libitum* upon the adequacy of punishment. We had existed for a considerable time as a community, regulated by laws guarded by penal sanctions, when this Bill of Rights was declared. We consider these sanctions as sufficiently rigorous, and we know that the best heads and hearts of the land of our ancestors had long and loudly declaimed against the wanton cruelty of many of the punishments practiced in other countries; and this section in the Bill of Rights was framed effectually to exclude these, so that no future legislature, in a moment perhaps of great general excitement, should be tempted to disgrace our Code by the introduction of any of these odious modes of punishment."

In *Wyatt's Case, supra* (6 Rand. [27 Va.] 694), the statute involved provided "that henceforth when any person shall be convicted of any crime or offense now punishable by imprisonment in the public jail or penitentiary for a period not exceeding two years, such person shall, instead of the punishment now prescribed by law, undergo imprisonment in the jail of the county or corporation where such conviction shall have taken place, for a period not

more than six months, nor less than one month, at the discretion of the court, and  *  *  shall moreover be punished with stripes at the discretion of the court, to be inflicted at one time or at different times during such confinement as such court may direct, provided the same to not exceed thirty-nine at any one time." The court held that the statute was not contrary to the section of the Bill of Rights under consideration, and in this connection said:

"The punishment of offenses by stripes is certainly odious, but cannot be said to be unusual. This court, regarding the discretion delegated by the act in question, as being of the same character with the discretion always exercised by common law courts to inflict fines and imprisonment, and subject to be restrained by the same considerations, does not feel itself at liberty in this case to refuse to obey the legislative will nor to execute that will by its judgments."

[8] The punishment of death by electrocution (which is the present mode of inflicting the death penalty in Virginia), as is well settled, cannot in itself be regarded as a cruel or unusual mode of punishment. *People ex rel. Kemmler* v. *Durston,* 119 N. Y. 577, 24 N. E. 6, 7 L. R. A. 715, 16 Am. St. Rep. 859; *In re Kemmler,* 136 U. S. 436, 10 Sup. Ct. 930, 34 L. Ed. 519; *Hobbs* v. *State,* 133 Ind. 404, 32 N. E. 1019, 18 L. R. A. 774; *State* v. *Wamsley,* 68 W. Va. 103, 69 S. E. 475; *State* v. *Woodward,* 68 W. Va. 66, 69 S. E. 386, 30 L. R. A. (N. S.) 1004; *McElvain* v. *Brush,* 142 U. S. 155, 12 Sup. Ct. 156, 35 L. Ed. 971—to mention only a few of the authorities on the subject.

As said in consideration of the eighth amendment to the federal Constitution (which is practically in the same language as section 9 of the Virginia Constitution), in *In re Kemmler, supra* (136 U. S. 436, 447, 10 Sup. Ct. 930, 933, 34 L. Ed. 519, 524): "Punishments are cruel when they involve torture or a lingering death; but the punishment of

death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life."

However there has been for a long while a difference of judicial opinion on the subject under consideration. And while a large majority of the American courts have taken the same view of the subject as that of the Virginia court, a minority of them have held that the constitutional provision in question imposes a limitation, not alone upon the legislative right to determine and prescribe by statute the *mode* of punishments, but also upon the *quantum* of punishments, upon the theory that punishment should be proportional to the gravity of the offense and that punishment may, by its length, or other severity, be so disproportioned to the offense as to constitute cruel and unusual punishment within the meaning of the Constitutional prohibition. There is a comprehensive review of the authorities on the subject in the majority and minority opinions of the Supreme Court in the case of *Weems* v. *United States*, 217 U. S. 349, 54 L. Ed. 793, 30 Sup. Ct. 544, 19 Ann. Cas. 705, which renders it unnecessary for us to do more in review of the authorities than to refer to those opinions. Only seven of the judges of the Supreme Court sat in that case, and only six of those were on the bench when the case was decided, of whom two dissented, leaving the majority opinion that of only four judges, a minority of the whole court of nine judges. Mr. Justice White filed an elaborate dissenting opinion, in which Mr. Justice Holmes concurred. The majority opinion was delivered by Mr. Justice McKenna. The latter opinion adopted the aforesaid view of the minority of the American decisions on the subject under consideration; but as the number of judges holding that view was less than a majority of the full court, that case cannot be considered to have settled

the question, and it may be fairly said to be still an open question in so far as the authority of the Supreme Court is concerned.

[9] However, we do not mean to say that the question under consideration is a closed question in Virginia. We feel that there is great force in the view that a statute might be enacted prescribing a punishment in *quantum* so severe for a comparatively trivial offense that it would be so out of proportion to the crime as to so shock the conscience that we would hold, and the courts of the State should hold, the statute void as in conflict with section 9 of the Virginia Constitution, although the mode of the punishment were not unusual. But such holding, even according to the majority opinion in the *Weems Case*, would have to be based upon the conclusion that plainly there could be found nothing in the conditions existing in the State and the circumstances of terror and danger accompanying the species of crime dealt with to give character and degree to it commensurate with the punishment prescribed by the statute; and that the legislative action was manifestly induced by some momentary impulse or passion, and was not well founded when considered from the standpoint of penal justice.

· As said in the majority opinion in the *Weems Case:* "We disclaim the right to assert a judgment against that of the legislature, of the expediency of the laws, or the right to oppose the judicial power to the legislative power to define crimes and fix their punishment, unless that power encounters in its exercise a constitutional prohibition, * * * there must be a comprehension of all that the legislature did or could take into account—that is, a consideration of the mischief and the remedy. * * there is a certain subordination of the judiciary to the legislature. The function of the legislature is primary, its exercise fortified by presumptions of right and legality, and is not to

be interfered with lightly, nor by any judicial conception of its wisdom or propriety.    *   *   *    we have expressed these elementary truths to avoid the misapprehension that we do not recognize to the fullest the wide range of power that the legislature possesses to adapt its penal laws to conditions as they may exist, and to punish the crimes of men according to their forms and frequency.   We do not intend in this opinion to express anything that contravenes those propositions."   Referring with approval to the holding in *Territory* v. *Ketcham,* 10 N. M. 718, 65 Pac. 169, 55 L. R. A. 90, that a statute, which imposed the death penalty upon any person who should make an assault upon any railroad train, car or locomotive, for the purpose and with the intent to commit murder, robbery or other felony upon a passenger or employee, etc., was not in violation of the eighth amendment to the federal Constitution, the Supreme Court majority opinion continues as follows:   "The Supreme Court of the territory   *   *   *   rested its decision upon the conditions which existed in the territory and the circumstances of terror and danger which accompanied the crime denounced.   So, also, may we mention the legislation of some of the States, enlarging the common law definition of burglary, and dividing it into degrees, fixing a severer punishment for that committed in the nighttime from that committed in the daytime, and for arson of buildings in which human beings may be, from arson of buildings which may be vacant.   In all such cases there is something more to give character and degree to the crimes than the seeking of felonious gain, and it may properly become an element in the measure of their punishment."

[10]  The same is true of the case before us.   It is a matter of history of the State, and of common knowledge among its people, that the crime of attempted rape is well nigh, if not altogether, as heinous as the consummated offense of rape.   It is well known that public indignation is as much

aroused by the one offense as the other, where the full accomplishment of the criminal purpose is thwarted only by some extraneous circumstance. And the almost universal repugnance which exists in the public mind to the making of the degree of the crime depend upon whether there has been an actual penetration or merely an attempted penetration, and the general aversion to the putting of the prosecutrix through the indecent and harrowing ordeal of having to testify in court upon such a subject, are well known. The likelihood of the resort to lynch law, unless there is a prompt conviction and a severe penalty imposed, and thus a resultant grave shock to the peace and dignity of the Commonwealth is well known to exist, almost if not quite equally, in the case of an attempted, as of a consummated rape. These are considerations which the legislature properly could, and which, therefore, we must conclude the legislature did take into account as an element of the measure of the punishment in enacting the statute under consideration and fully justified the severity of the extreme penalty allowed by the statute to be imposed, even from the standpoint of the holding of the majority opinion in the *Weems Case.* Indeed the changes in the statute itself since the Code of 1887, which have been referred to, making the maximum and minimum punishment more nearly alike for attempted rape, with that for the consummated crime, furnishes internal evidence in the statute itself that the legislature in its enactment in its present form has followed and conformed the law to a matured public sentiment on the subject of the punishment deemed commensurate with the crime, and has not acted under the influence of any momentary impulse engendered by excitement or passion.

It will be observed, however, that the statute law on the subject still recognizes some difference in the heinousness of the respective offenses in that the minimum penalty prescribed for rape is five years, whereas that for attempted

rape is only three years in the penitentiary; and the maximum confinement in the penitentiary for rape is twenty years, whereas that for attempted rape is eighteen years.

Therefore, without at this time deciding the general question of whether the constitutional provision under consideration does or does not impose a limitation upon the legislative power of prescribing the *quantum* of punishments for crimes, we hold that the statute in question in the instant case is not violative of the Constitution, and that the punishment imposed upon the accused in the instant case, in accordance with the authority of such statute, was a lawful punishment and cannot be disturbed by us as prohibited by the Constitution of Virginia.

The authorities, consisting of 1 Bish. New Cr. Law, sec. 604 (5); 1 Wharton's Cr. Law (11th ed.), secs. 238, 308, referred to and relied on in argument for the accused, on the subject of punishments, address themselves to the philosophic theories upon which penal legislation is, or should be, based, and do not at all treat of the power, or lack of power, in the courts to hold such legislation invalid because not in accord with what may be considered the correct theory. The former subject has furnished a theme for endless discussion among philosophers, criminologists and other writers, both in ancient and modern times. See sections 1, 10, 12 of 1 Wharton's Criminal Law, and notes thereto, among which is a reference to a philosophic article by Sir Edward Fry, which points out that there are cases in which the attempt to commit an offense completes the crime so far as it relates to the criminal, as (to quote the example instanced by the learned writer), where "the gun has been loaded, the victim has been tracked, the watch has been kept through long hours of patient wickedness, the gun has been aimed and discharged, but the victim escapes." The writer adds: "On the primary principles of punishment, that man appeared to be worthy to be punished as a murderer."

So, in the instant case, the cloth to smother the outcry has been gotten ready, the victim has been tracked, the watch has been kept through the hours of wickedness needed to accomplish the waylaying (how long does not appear in the record), the assault has been made upon a girl of seventeen and continued in the darkness in a manner demonstrating an absolutely fixed intent to accomplish the crime intended; this conduct is persisted in against the desperate struggles of the victim until she is about exhausted, but the victim escapes. The jury were fully warranted by the facts proved in concluding that the escape was not due to any voluntary relenting on the part of the assailant; but solely to one of the two extraneous and unexpected happenings, or to both of them, namely, to the fact that he looked back over his shoulder and saw that the two men, Cressman and Southards "had stopped about twenty or thirty feet from the accused and  *  *  *  were observing him," at which time "he turned the girl loose;" or to the fact that in the struggle the discharge of seminal fluid, mentioned in the certificate of facts, had rendered the accused impotent to accomplish his purpose for the time being. And the parting kiss, and the blandishments, bestowed under the circumstances, were sufficient evidence to warrant the jury in believing that the aforesaid purpose of the accused still remained fixed, notwithstanding the unanticipated miscarriage of the undertaking upon that occasion, if haply he' might later find, or make, another and a more propitious occasion. And this continued purpose, coupled with the presence of the two observers, was sufficient evidence to account to the jury for the fact that no other violence was used against the prosecutrix following the abortive assault.

[11] 3. Was the accused given reasonable opportunity to employ counsel and prepare for trial?

This question must be answered in the affirmative.

We find nothing in the record indicating that the accused was not given reasonable opportunity to employ counsel and prepare for trial. No motion was made for a continuance of the case. We cannot assume that if there had been any reasonable ground for a continuance a motion would not have been made by the counsel assigned by the court, who represented the accused upon his two trials in the court below. There is no indication in the record that the accused was not entirely ready for trial on both occasions. The fact that there was a hung jury on the first trial would indicate that the defense of the accused was fully and ably presented by his counsel on that trial. The second trial occurred two days after the beginning of the first trial, and the same counsel then represented the accused as on his first trial.

In *Harris* v. *State,* 9 Okl. Cr. 658, 132 Pac. 1121, relied on in behalf of the accused, the trial was had on the very day the amended information was filed on which the defendant was tried. But this was, over the objection of the defendant, made at the time, the court overruling his motion for a delay (which, by the way, asked for a postponement of only twenty-four hours), and forcing him into immediate trial.

The sole remaining question presented for our decision by the assignments of error is the following:

[12] 4. Is the verdict contrary to the evidence?

This question also must be answered in the negative.

It is contended in behalf of the accused that the verdict is so plainly contrary to the evidence as to shock the conscience of and to satisfy the court that the jury must have been influenced by passion or prejudice. We find ourselves unable to agree with this view of the subject.

In this connection we refer to what we have said above concerning the facts of the case and the inferences we think the jury were reasonably warranted in drawing therefrom.

To what we have there said we think it necessary for us to add but little here.

*Woodson's Case,* 107 Va. 895, 59 S. E. 1097, is strongly relied upon in argument for the accused as authority for the position that there is not sufficient evidence in the instant case to show that the accused intended to attempt to commit the crime of rape. The distinguishing feature in *Woodson's Case* was that in that case there was no attempt to use force, only solicitation. In the instant case there was no solicitation, and there is the uncontroverted fact of the use of violent force by the accused in the effort to overcome the desperate struggle of the prosecutrix, which force was continued until the latter was almost exhausted, and was then terminated only because of one or both of the extraneous reasons above indicated, as the jury were warranted in believing from the facts proved.

As to the intent with which the assault was made: The mode of the attack and the manner in which the force was exerted, unaccompanied by any explanation or indication in the facts certified tending to show any other motive, was sufficient to warrant the jury in finding that the accused intended the natural result indicated by his conduct as intended, namely, the rape of the prosecutrix. Moreover, it was shown in evidence that on his first trial the accused admitted that the assault was made with that intent.

There are various other positions taken in argument for the accused, which are not taken in the assignments of error and which, therefore, ordinarily would not be considered by us. But in view of the fact that human life is involved we have not allowed this consideration to deter us from considering every argument presented in behalf of the accused. We deem it sufficient to say, however, concerning the positions not embraced in the assignments of error, that we have carefully considered them all and have been unable to find any merit in them.

This case must, therefore, be affirmed.

*Affirmed.*