# Richmond

## BILLIE HALBERT SATTERWHITE v. COMMONWEALTH OF VIRGINIA.

January 18, 1960.

Record No. 5026.

Present, Eggleston, C. J., and Spratley, Buchanan, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*George E. Allen* (*Allen, Allen, Allen & Allen* on brief), for the plaintiff in error.

*Thomas M. Miller, Assistant Attorney General* (*A. S. Harrison, Jr., Attorney General*, on brief), for the Commonwealth.

WHITTLE, J., delivered the opinion of the court.

Satterwhite, a sixteen-year-old youth, was indicted for rape and tried as an adult before the court without a jury. He was found guilty and sentenced to forty years in the penitentiary, the last thirty of which were suspended.

A motion was made to set aside the judgment on the grounds (1) that the evidence was not sufficient to show guilt beyond a reasonable doubt, and (2) that the sentence was excessive. The motion was overruled and we granted a writ of error.

The defendant's contention that the evidence was insufficient to establish the crime of rape requires that the evidence be stated in detail.

Elsie Lorraine Jenkins, the prosecutrix, testified that she was twenty years of age, married but separated from her husband, lived on Hanover Avenue in the City of Richmond, and was a clerk-typist; that she was at the time unemployed and had applied to Manpower, Incorporated, an employment agency, for work. On July 22, 1958, someone from the employment agency called her on the telephone and told her to go to a Mr. Williamson at World Radios, Limited, Stop 12½, Petersburg Pike, which was a long distance from downtown Richmond. On July 23rd, between 8:00 and 9:00 a.m. she went to the designated place but could not locate World Radios, Limited, and telephoned back to the agency and was told that Coles Street was the proper address.

The witness stated that she went out and looked down the block, saw some machinery and walked down the street where she met the accused. He asked her if she was looking for Mr. Williamson of World Radios, Limited, she told him she was, and he said to her "Come into the house. Mr. Williamson is down the street. I work for him." She went into the house but did not see any office equipment there and inquired of the accused as to where the office was and was told "Mr. Williamson is going to make an office out of it [the house]." She walked around in the house and looked across the hall and saw a bedroom at which time the accused pushed her into the bedroom and knocked her on to the bed. She asked him "Are you crazy?", and "he then told me what he wanted."

She testified that she tried to get away from him but he "knocked me on to the bed again and took the pillow from the pillow case and said 'I will smother you.'" She tried to get up, told him she

wanted some water, and he pulled her into the kitchen and "I then went into the back room thinking that I could lock the door, but it had no lock on it;" then "he pulled my clothes off;" she struggled with him and scratched him, "and then he raped me."

She further testified that after this he tied her up in a chair using some women's belts and an electric cord; he had knives and stuck them in the chair and told her not to scream; she remained tied in the chair five or ten minutes while he went out. He came back and cut her loose and took her to his mother's home two doors away. No one was in the home at the time. He then took her to a hamburger place where she went into a bathroom thinking she could escape through a window but found the window so small and up so high she could not get out. She told him she was sick and asked him to take her to a drug store. They went a short distance to a drug store where she found a woman clerk and told her what had happened and the clerk called the police.

The prosecutrix further testified that she made every excuse she could to get away from the accused. She stated that in going from the vacant house to his mother's home they did not see anyone. They remained in his mother's home about fifteen minutes and while there she tried to get his mind on something else so as to enable her to escape but could not. In going from his mother's home they walked on the Petersburg Pike to the hamburger place four blocks away. They passed two elderly ladies sitting on a porch about 25 feet from the street, and she did not see or hear anybody else in the neighborhood until she saw these two old ladies, "The two old ladies were there, * * * where I ran into the house screaming, the house that was a block away, I could not tell whether there were people out in the yard or what, but I did scream out there."

On cross-examination the witness stated, "I thought he was going to kill me;" "he had knives there in the house and had this pillow that he tried to smother me with."

Police officers, Owens, Wellford, and Wakefield, testified. Officer Owens testified that they immediately responded to the call from the drug store where the counter clerk told them a girl in the back wanted to see them. He stated they went back and found the victim in a hysterical condition; she could hardly talk, and he noticed the marks on her legs. He said she stated to them that the boy had assaulted her and tied her up, and that she pointed the accused out to them.

Police Sergeant Wellford testified that when he arrived at the drug store the victim was crying and upset and was wringing her hands; that after she calmed down enough to tell some of the details she showed him her wrists which were red with marks as if she had been tied around both wrists, and that below the knee on both legs there were red marks approximately half an inch wide; that she was in such a condition that he called an ambulance and had her taken to the Medical College of Virginia Hospital; that the accused was arrested and taken to Police Headquarters.

Police Sergeant Wakefield stated that he investigated the matter, first going to the hospital but he did not talk to the victim; that he then went to headquarters where the accused was interrogated; that accused at first denied knowing anything about the crime, but after the police told him what they knew he admitted he was the one involved and that he had called Manpower, Incorporated, using the name of Mr. Williamson, and had requested that a stenographer be sent to 2401 Coles Street; that he lived at 2403 Coles Street; that accused had a fresh scratch mark on his face; that he asked him about the scratch mark and he could not explain it; that when he went to the scene of the crime he found the house as the victim had previously described it; that there was a huge overstuffed chair, with holes cut in the overstuffed arm of the chair, and that an electric cord and some women's belts which had been cut in half were lying on the floor in and around the chair; that there was a pillow on the bed from which the pillow slip had been removed; that the victim pointed out the side door of the building which led out into a field where she said she had run in an attempt to get away and where she had been apprehended and brought back by the accused; that he noticed a bruise on the neck of the victim when he was talking to her; that one of the knives introduced as an exhibit was found near the overstuffed chair in which the victim had been tied up, and another knife was found on a table in the room.

The accused testified in his own behalf. He stated that he was between 5 feet 9 and 5 feet 11 in height and weighed between 155 and 160 pounds; that he was sixteen years of age, a second year high school student and a sergeant in the school's military corps; that he called Manpower, Incorporated, and asked for a stenographer, using the name of Mr. Williamson of World Radios, Limited; that he did it as a joke, thinking it would be "cool"; that he asked Manpower to send the stenographer out the Petersburg Pike to the non-existent business;

that he gave the false name of Williamson, and also gave the address of the unoccupied house. He testified that he saw the victim looking for World Radios, and that when he saw her it came into his mind for the first time to have sexual intercourse with her; that when he spoke to her he told her his name was Roland Marshall and directed her to the unoccupied house, stating that it was to be fixed up as an office for World Radios; that when she came into the house she walked into the bedroom, and "I kind of knocked her down, you know, against the bed, and all that stuff." He stated that he had a hunting knife with a heavy blade on it which he used "to cut things with"; that the knife was in his back pocket and could be seen with the blade sticking out; that after they had sexual relations he tied her up in the chair and cut holes underneath the arms so he could run the belts through; that he also used an electric wire in tying her up; that he had the knife in his pocket after he cut her loose and took it out and used it for cutting down some briers in the field so they could go the back way to his mother's home; that the prosecutrix knew he had the knife with him all the time from the time he cut her loose from the chair; that he tied her up because he was scared and did not know whether she was going to "go yelling or yapping about it or something like that;" that his conscience had begun to bother him about the time he tied her up; that while the victim was tied up he went to his mother's home and called a friend on the telephone and tried to get his friend to come down there and see the girl "tied up". He stated that the prosecutrix had consented to the intercourse.

Where the prosecutrix is sixteen years of age or more and not under any physical or mental disability as defined in the statute, unlawful carnal knowledge of her by force and against her will constitutes the crime of rape. Code § 18-54. To sustain the charge there must be evidence of some array or show of force in form sufficient to overcome resistance, but the woman is not required to resist to the utmost of her physical strength, if she reasonably believes resistance would be useless and result in serious bodily injury to her. *Bradley* v. *Commonwealth*, 196 Va. 1126, 1135, 86 S. E. 2d 828, 833.

We cannot say, as contended by the accused, that the evidence in this case is incredible. In fact, the only disagreement in the testimony of the prosecutrix and that of the accused is whether or not force was used.

The evidence is clear that this young woman had been lured into

this trap by the diabolical scheme of the accused. She went this long distance out on the Petersburg Pike in search of legitimate employment, and it is hardly conceivable that she calmly yielded to the suggestion of the accused that they have sexual intercourse. The fresh scratch mark on the face of the accused; his tying the victim in the chair; his bringing her back when she attempted to escape, and the bruises on her neck, arms and legs, negate the contention that the intercourse was not by force and against the will of the victim. Certain it is that her account of what happened is not as incredible as his.

Here the trial court heard and saw the witnesses when they testified. In testing the credibility and weight to be ascribed to the evidence in such an instance, we must give the trial court the wide discretion "to which a living record, as distinguished from a printed record, logically entitles him. The living record contains many guideposts to the truth which are not in the printed record; not having seen them [the witnesses] ourselves, we should give great weight to the conclusions of those who have seen and heard them." *Bradley* v. *Commonwealth, supra,* 196 Va., at p. 1136, 86 S. E. 2d, at p. 834.

We have no right, under the related circumstances, to disturb the judgment of the trial court.

The contention that the punishment was excessive is without merit. The sentence imposed was within the statutory limits fixed by the legislature and should not be disturbed on appeal. *Hart* v. *Commonwealth,* 131 Va. 726, 741, 109 S. E. 582; *McCann* v. *Commonwealth,* 174 Va. 429, 448, 4 S. E. 2d 768, 775.

For the reasons stated the judgments are

*Affirmed.*