# Staunton

SAMUEL W. GRAY v. COMMONWEALTH OF VIRGINIA.

September 5, 1945.

Record No. 2996.

Present, All the Justices.

The opinion states the case.

*Frank L. Ball* and *John C. McCarthy*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *V. P. Randolph, Jr., Assistant Attorney General*, for the Commonwealth.

HOLT, J., delivered the opinion of the court.

Samuel W. Gray stands charged with having raped Miss Frances Lillian Rice. He was indicted and tried by a jury which returned this verdict:

"We the jury find the defendant guilty, and fix his punishment at seven (7) years in the State Penitentiary.

(Signed)   R. E. Remington, Foreman."

That verdict was approved by Judge McCarthy and on it judgment was entered. It is now before us on a writ of error.

These rules have long received the imprimatur of this court: We approve juries' verdicts upheld by credible evidence. If the evidence is inherently incredible, we set them aside. Before one can be convicted, guilt must be proven beyond any reasonable doubt, but it is for the jury to say if that degree of proof has been reached.

We sit as an appellate court and do not examine *de novo* the evidence which the jury relied upon. When we come to examine it, if the verdict is sustained in the manner indicated, it stands; not otherwise. In conflicts of evidence or testimony we follow the jury. Most cases turn upon evidence, and that is particularly true when rape is charged, and so it becomes necessary that we examine this evidence in some detail.

Since the defendant's major contention is that Miss Rice's account of her experience is inherently incredible, and since it is in narrative form and coherent, we set it out in full:

"Frances Lillian Rice, a witness for the Commonwealth, testified as follows:

"That she is 27 years old; came from Boston, Massachusetts; lived at 1724 Abingdon Drive, Alexandria, Va.; is a member of the U. S. Naval Reserve; came to Washington April 15, 1943; had lived with uncle and aunt in Boston before her enlistment; mother and father are both dead; attended high school and business college before enlistment; worked at time of the alleged crime in the Navy Building on Constitution Avenue, Washington, on the 3:30 P. M. to 12:30 A. M. shift. On August 10th she got out on Constitution Avenue about 12 o'clock, midnight, and was waiting at bus stop when defendant and another man came along in a two seated automobile and after passing her, backed up about 30 feet and offered to carry her home; she told them she was going near the airport and defendant said he was going to take his friend down to Alexandria and it would not occasion any inconvenience to take her.

One of the men (Jack Jones) got out and she got in the front seat next to the driver (the defendant) and Jones got back on the outside seat. Her apartment was located between Mt. Vernon Avenue and Monroe Avenue, Alexandria, and she thought the defendant was taking her home. They came out over Memorial Bridge and along Arlington Ridge Road. They stopped somewhere and let Jones out and the defendant drove her on, but she didn't recognize the roads and still thought she was on the way home. Defendant stopped, got out and walked around behind to the rear of the auto and out of sight and in a few minutes returned and got back in. He then drove around for five or ten minutes and pulled off the main road and stopped near a steam shovel. He asked her to come close and she said no. He put his arm around her and pulled her over to him. He put one hand over her mouth and in some manner got her down on the seat with her head on the driver's side. She told him she would report him to the Navy and he said I'll kill you first. She got the door open on the driver's side and he grabbed her hand away so she couldn't pull herself out. He told her if she didn't open her legs he would crack them open. She screamed as he would take his hand off her mouth and he would put his hand back on her mouth again and hold it there until she felt like smothering and he would take his hand off again and she would scream some more. She heard an auto blow and stop and thought its occupants had heard her, but it went on. He got her legs apart and arranged himself and got her in position where her legs were out the right front door—both doors being open. She kicked at him and missed him. He kissed her before the act of intercourse and during it but she did not kiss him. She tried to get out of the car. He told her she had put up such a fine battle he was going to do it anyway. She told him she wanted to remain a virgin. He pulled her toward him and proceeded to have intercourse with her. She told him she felt sick and he said you'll feel sicker than that before I get through. She asked him not to make her pregnant and he said he wouldn't. She said she didn't want to become preg-

nant through no fault of her own and he said she needn't worry he had taken it out just in time. She cried. He got out of the car and took out his handkerchief and walked around the car from the righthand side to the left and got back in the driver's seat and she remained in the car. He told her he wouldn't take her home until she stopped crying and they then started driving and drove around for three-quarters of an hour—at one time passing a point marked 'Bailey's Cross Roads' several miles away. He drove her back to her apartment, and into the driveway immediately in front and there talked with her about a date. She told him she had dates on each of the next three nights and he didn't ask any further. He made her kiss him good night and she then left the car and went into her apartment. When she got in the apartment Elizabeth Wood (one of the girls she was living with) was in the living room with her fiancé, Earl Kimball. Elizabeth and Earl asked her why she was out so late and what was the matter and she told them the whole story. It was then about two o'clock. She washed out her panties and after about 30 or 40 minutes went to bed but didn't sleep very much.

"She said that during the intercourse she didn't know where the defendant had his feet but that he was on top of her and that sometime during the act her shoe came off and after it was over he picked it up and put it back on. She was in pain during the act. He slapped her once. Her lip was cut and her shoulders bruised.

"She was dressed in the summer clothes of the Waves, Navy Gray in color and had on panties with elastic in the middle and a little loose around the legs and a tight fitting girdle. Neither the girdle nor panties was taken off or pulled out of place and neither was torn. He pulled one leg of the panties aside to get to her. That he didn't ask her to permit him to have intercourse but told her he was going to do it. That she didn't have any apprehension or fear until he had stopped his auto the second time and asked her to move over to him. Up to that time she had been sitting

at the extreme right end of the seat as far away from him as she could.

"On the next morning she got up before Elizabeth Wood left the apartment and saw her. About ten o'clock she dressed and went to the Navy where she saw Dr. Slack who sent her to Dr. Dailey for a physical examination and was there until about 4:00 P. M. She and Lieut. DeZoort and Lieut. Miller of the Navy and Officer West of the Arlington Police talked it over late that afternoon. She rode around on the 12th with Lieut. Miller and couldn't find the place where it occurred. On Monday she was taken by Lieuts. DeZoort and Miller and Arlington officers to a point on Columbia Pike and waited until a bus came up and the defendant was the operator. As soon as he stepped off she recognized him. She went along with the officers and defendant from that point and the defendant pointed out where the act had taken place and she then recognized it. It was close to the A. B. & W. bus garage. She had seen a row of lights on the night it occurred and they had stopped near a steam shovel.

"She said the defendant had given his name to her as Tommy; that she knew he was a bus driver from his uniform but didn't know what company he worked for and that she never knew what company he worked for or that his name was Sammy until he was arrested.

"On cross examination she stated that she didn't try to scratch or bite the defendant—that she kicked at him several times but missed him and likewise tried to hit him but missed —that she twitched her body from side to side. She said she didn't know how he got her down—that he held his left hand over her mouth while he was getting himself arranged and getting her legs apart—occasionally pulling his hand away from her mouth to use both hands about his actions. She said both doors were open and she screamed loudly and frequently as his hand was taken off her mouth. She said she asked him not to make her pregnant and that during the ride after the act she discussed with him the possibility of her being pregnant and he told her she would not become

pregnant and that he told her to use a douche. When he stopped the first time and got out and went around out of sight she had no fear and thought he was carrying her home and didn't try to get out. That they were then on the edge of the parking lot of the A. B. & W. bus garage. That when the act was over and he was around the rear of the car rearranging himself she neither tried to get out nor did she scream. She said that he stopped at her apartment in taking her home and drove into the driveway right in front of her window—that the light was on—that she didn't scream but sat in the car and suffered him to kiss her and permitted him to drive away without alarm. She said he didn't at any time threaten to injure her if she didn't have intercourse with him. She stated that the bruises on her shoulders came from rubbing them against the seat. When asked if he just casually pulled her panty leg aside to get to her privates she said yes. There was just a slight trace of blood stain on her panties when she got home and she washed them immediately and didn't show the stain to any one.

"She stated that she had been down No. 1 Highway before and along Arlington Ridge Road and had on one occasion visited friends in the neighborhood where Gray had let Jack Jones out. She stated that she lived in an adjoining neighborhood. She said that she thought he was carrying her home after Jones got out and didn't know they were driving away from Alexandria and didn't see the lights from Washington. She denied that defendant had at any time given his name as Sammy or that he had said what bus company he worked for.

"She said the defendant did not show any weapon of any kind or mention any.

"She stated she was badly frightened at the time of the act but did not claim that she was afraid to fight and said she tried to both hit and kick him but missed on each occasion. She didn't know how her shoe came off.

"She was a virgin and had a sweetheart in the armed services overseas.

"She did not make any report to police and she did not know who made the report. That no alarm of any kind was made until after she had talked with the Navy authorities and no search made for her assailant until late on the afternoon of the 12th.

"She did not mention any bruise on her leg. On Friday, the 11th, she was stiff and sore and had a severe pain in her shoulders and back. Her lip was cut and swollen."

Miss Elizabeth J. Wood shares an apartment with Miss Rice. She said that on the morning of August 11, at about two o'clock, Miss Rice came in, apparently very much excited. Her eyes showed that she had been crying but she was not crying at that time. Her face and lips were swollen and one lip cut and bleeding. She complained that her back and arm hurt. There was then present in the apartment also one Earl Kimble, Miss Wood's fiancé who was about to leave the country. Miss Rice as soon as she came into the apartment began to cry and told them the story of what had happened.

Hugh Jones is a captain of detectives on the Arlington police force. On August 14, in company with Miss Rice, and Officer West, another police officer, they drove to a point in Arlington county where they expected to meet Gray. Gray was there and was immediately recognized by Miss Rice. They told him what the charge was. He said that he did not know why she was kicking because she did not object at the time. He then took them to a point where the incident was said to have occurred. It was a block from the A. B. & W. bus garage depot and shop, and behind a mound about twenty feet high; from that point these shops could not be seen. He said that from the place of the occurrence a row of lights could be seen in the distance. He had known Gray for a number of years, who was commonly called Sammy.

Stephen C. Miller, a lieutenant in the U. S. Navy, is a lawyer by profession and was assigned to investigate this charge. He saw Miss Rice for the first time on the afternoon of August 11th. With her they attempted to locate

the situs of the incident but failed. They again undertook to do this on August 14th and went to a point near the bus company shops, where drivers were changing buses. It was then that Miss Rice pointed out Gray to him. Gray got into their car and together with Officers West and Jones drove to a point where Gray pointed out the place where he parked his car. They then went to the office of Mr. Rucker, Assistant Commonwealth's Attorney. With them also was Lieutenant DeZoort.

Miss Rice was excused while Gray gave his version of what occurred. Gray said that "he pulled her over and tried to have intercourse with her. That was against her will in a way—that she put up a fight but not too much; that she had said that she didn't want to become pregnant and he had told her to use a douche." He explained how it occurred and said that she was on the front seat and he had his feet either on the steps or on the ground. He said that after the incident had closed, she was in tears and he drove her around that she might quiet down. He then drove her to her apartment. They sat in front of it for a time, discussing dates and mentioning two or three nights, but she told him no. She kissed him goodnight and went into the house.

On cross-examination point was made of the fact that this witness had then taken notes. They were called for, produced & read:

> "2 blocks from home
> 'don't get me pregnant' during intercourse. No beating or struggling.
> Puuled hr over. Nervous, scared, excited. No cooperation. Didn't fight a whole lot. Against her will in a way. Frightened. Cried afterwards. Long talk about boy friend.
> Come & meet her
> Stood on outside of car & kissed him good bye. Stood on outside of car pointed to her house door. Talked to him. Parked car—asked about taking her to dance.

Told her what to do to protect herself—virgin.
Said Shift 12 to 7:30.  Doing anything next night—Friday—not free until Mon. did not want to go out."

Miss Marie DeZoort was a lieutenant in the Naval Reserves and was assigned to duty as an investigating officer.  On August 11th Miss Rice came to see her, having been referred to her by Dr. Slack.  On August 12th, with Lieutenant Miller, Miss Rice and Officer West, they attempted to locate the spot where the incident occurred but were unsuccessful.

On the afternoon of August 14th, in company with Miss Rice, Lieutenant Miller and Officer West, she started out again on an investigation.  They found Gray in company with a number of other bus drivers.  Miss Rice then pointed out Gray, who joined them, and Gray then took them to the point where his car had been parked.  From there they went to the courthouse and had a conference in the office of Mr. Rucker, Assistant Commonwealth's Attorney for Arlington county.  It was then that Gray said "the intercourse had been against Miss Rice's will in a way and that she had fought but not too hard."

In a note taken by this witness at that time this appears:

"Did not hit her
Said 'Do not *ge* me pregnant—Said you need not worry.
Both feet outside of car
Did pull her over—She was nervous—Did not kick, scratch or bite.  Gave no*t* coop*r*ate, but did not fight.
In a way against will.  Was frightened.
Went for ride, talked great deal  Not much hard feeling.  Req'd going to show or dance.
She stood on side of car, closed door, talked thru window,  Stood on door & kissed at apt."

Officer West could not be present as a witness.  By stipulation it was agreed that, if present, he "would testify that when he saw Miss Rice prior to Gray's arrest she told

him that the man she claimed had raped her had given his name to her as Sammy and was wearing a uniform with the A. B. & W. Bus Line on it and that she did not say that he had given his name as Tommy."

Edmond F. Dailey also is a lieutenant in the Navy. He is a graduate of Georgetown Medical School, had practiced medicine in civil life and specialized in obstetrics. He saw Miss Rice around ten o'clock on the morning of August 11th. She was then nervous and excited. Her upper lip was swollen, bruised and black in color; her left shoulder was bruised; there were 10 or 12 scratch marks on her left forearm and wrist; a bruise on her right arm and another bruise on the inside of the thigh of the left leg, about two or three inches in diameter. Appearances seemed to indicate that she had been a virgin.

This ends the Commonwealth's case.

This evidence was introduced on behalf of the defendant:

James A. Jones was also a bus driver and rode with Gray to the bus station where Miss Rice stood. Gray asked if he could carry her home; Miss Rice told him where she lived. He asked her if she wanted to take a ride and she stated that she had not seen much of the surrounding country and would like to do so. She got in and sat by Gray. Jones moved to the back seat. He lived in Alexandria, and Miss Rice lived only a few blocks from his home. Jones, when near his home, got out, and Gray drove on. He was known as Sammy.

Roy D. Morris and Sanford E. Watts worked in the bus company's repair shop. Each of them said that the night was warm and the shop windows were open, and that you could hear an ordinary conversation from where the shop stood to where the occurrence charged took place and that they heard no outcry of any sort.

Gray testified on his own behalf. He said that he is 25 years old, weighed 215 pounds, is married and had a small child and worked for the bus line; that as he drove by the bus stop he saw Miss Rice and a few other people standing there. Miss Rice walked up to his car. He asked her where

she was going and she said down near the airport on the road to Alexandria. He told her that Jones was going in that direction and that he would take her home. She got in and said that she would like to take a ride since she had not seen much of the country around Washington. They drove on and stopped near the Jones' home. When Jones got out, he asked Miss Rice again if she would like to take a ride and she said she would. They drove on and stopped where the offense is said to have been committed. From that point the shop and its lights were in sight. He put his arm around her and pulled her over to him. She asked him what he was going to do, and he said "you ought to know." She told him that she wanted to remain a virgin and that she had never done anything like that before. He kissed and caressed her. She was lying on the front seat with her head on the driver's side. He was standing on the ground with both car doors open. She slid her body over to him, put her legs around him, and intercourse followed. During the act one of her shoes came off. He picked it up and put it on her. He said she did not scream but did not cooperate, and during the act she asked him not to make her pregnant, and then began to cry. He did not drive her directly back to her apartment because she was then crying and he wanted her to calm down. Afterwards he drove in front of her apartment. Its lights were on. They talked for ten or fifteen minutes. He attempted to make a date with her for either of the three succeeding nights. She said she couldn't make a date for any of them. He did not press her further. She kissed him goodnight, and he went home. He said that he had in mind to have intercourse with her, prompted by the fact that she was getting into the car with a stranger. He said that he never slapped her, hit or threatened her in any manner, and that he himself did not have any scratch or mark on him.

It is said that she could not state the manner in which she got down on the seat in the automobile and that the claim that the man stood outside the door with her lying across the seat and in that awkward position, with his left hand over

her mouth, arranged himself and proceeded with the act of intercourse challenges human credulity.

Certainly a woman who is being raped should give an account of how it was done, unless she was beaten into insensibility. This is her account:

"He asked her to come close and she said No. He put his arm around her and pulled her over to him. * * * She screamed as he would take his hand off her mouth and he would put his hand back on her mouth again and hold it there until she felt like smothering and he would take his hand off again and she would scream some more."

It is true that Miss Rice did not undertake to state the manner in which Gray got her down on the seat in the automobile, and her failure to do this is a matter of moment. On the other hand, if she were attempting to build up a case against him, she would have undertaken to supply this omission in detail and would have described just what the "brute" did. Gray, himself, said that he stood on the ground by the righthand open door. It is said that the band or belt of her undergarment was not torn or broken. She tells us how Gray found it possible to accomplish his purpose without loosening this girdle, and her statement the defendant himself has not undertaken to dispute.

It is said that she did not scream, and two witnesses working in a bus repair shop with open windows, which was a block away, say they did not hear her. A repair shop is not the quietest place in the world, and these witnesses were not listening for outside appeals.

It is said that she did not scratch or bite him. Her lip was cut, her arm was bruised, and there were ten or twelve scratch marks on it. She weighed 135 pounds; he 215 pounds. It may well be that he suffered no physical violence at her hands.

There is some confusion as to names. Whether he said that his name was Sammy or Tommy is unimportant. It is also true that across his shirt were the initials A. B. & W. Bus Line. In these days of multiple alphabetical combinations, it probably told Miss Rice little. Of course she knew

that he was a bus driver. It is said that during the course of intercourse she calmly asked him not to make her pregnant. There was nothing calm about it. Her lip was cut and her body bruised. The possibility of pregnancy was an added horror which would always be embarrassing to explain and when explanations might be received with lifted eyebrows. It is not incredible that she should in these circumstances have added this appeal to physical resistance. Afterwards, Gray did not drive her directly home; she was crying and hysterical, and he said that he wanted her to quiet down. When finally they drove up to Miss Rice's apartment, Gray suggested dates but unsuccessfully. He said that she then kissed him goodbye and he drove away.

When a young woman, unaccompanied, starts off on a midnight cruise in the summertime with a lone young man, the situation bristles with possibilities, some of which approach the ambit of *res ipsa loquitur*. But that is not this case.

Miss Rice stood at a bus stop for Alexandria-bound buses. The defendant and his friend, Jack Jones, stopped in a car and asked if they could "carry her home." She said that she was going near the Washington Airport, and he replied that he had to go to Alexandria and that to take her home would be no trouble at all. They did not start out on a midnight cruise, and Gray was not alone but with him there was another man. She did not then know where Jones was to leave them. Two men do not often make arrangements to seduce or rape one woman. Together they gave protection as against each other.

Miss Rice was 27 years old, with an excellent background, was in the active service of her country, engaged to be married and was a virgin. We are asked to believe that she voluntarily surrendered her person to a bus driver whom she had never seen, and this notwithstanding the fact that within about an hour after the incident she reported her experience to her apartment mate and her friend. At that time her face was swollen with tears, and her lip was cut and bleeding. Moreover, on the forenoon of that day she made a

report to that Department of the Navy which was her overlord. It appointed an officer who was also a physician to investigate the charge. He found that apparently she had been a virgin and that her person bore multiple evidences of injury.

Inherent incredibility is a two-way street.

That Gray accomplished his purpose is not in dispute. Scarcely less questionable is his use of force. The testimony of Lieutenant Dailey (doctor) is not challenged. Indeed, Gray himself said that the "intercourse was against Miss Rice's will in a way and that she fought but not too hard."

The burden of the defense is that Miss Rice acquiesced in all that was done and certainly that she afterwards condoned it. All of this was thrashed out before the jury by able counsel and finally passed under review before an able judge.

▋ Objection was made to this instruction:

"The court instructs the jury that while the element of force is an essential element in the crime of rape, and while you must believe that the force used was sufficient to overcome the will of the prosecutrix, yet if you believe that the mind and will of the female were overpowered by fear induced by the man, and therefore she made less resistance than she may otherwise have been capable of making, it is rape nevertheless. In this connection, you may consider the time, the place, and relative physical strength and endurance of the prosecutrix and the accused, the whole situation as it confronted her, and all of the circumstances disclosed by the evidence."

That objection reads:

"The foregoing instruction was granted at the request of the Commonwealth and the defendant excepted and stated as ground of exceptions that the said instruction was not supported by the evidence that the mind or will of the prosecutrix was overpowered by fear or that she was caused by fear to offer less resistance than she might otherwise have been capable of making."

It in substance amounts to this: The evidence does not sustain the verdict.

These are some of the conditions upon which this instruction rests: Gray told Miss Rice that he would kill her if she told on him. He weighed 215 pounds; she weighed 135. Her body bore multiple physical evidences of his assault, and as it ended she was hysterical and in tears.

Instructions given accurately set out the law which governs this case; particularly those given at the instance of the defendant set out every phase of his defense.

The measure of force necessary to constitute rape and the measure of resistance required are pre-eminently questions of fact and were submitted to the jury on this instruction given at the instance of the accused, which covers the heart of his case:

"The court instructs the jury that the burden is on the Commonwealth to prove every essential element of the crime charged. In this case, before you can convict, you must believe from the evidence beyond all reasonable doubt, not only that an act of intercourse had taken place between the prosecutrix and the defendant, but also that the act was accomplished by the defendant by force and violence and that the prosecutrix resisted by every means within her power. Considering the surrounding circumstances each of these things must be proved by the Commonwealth and failure to prove any one of them beyond all reasonable doubt is fatal to the prosecution and calls for a verdict of not guilty."

Moreover, when Gray offered to take Miss Rice home, by his own admission he had in his mind an ulterior purpose—he "made up his mind shortly after she got into the auto to try to have intercourse with her." Her testimony is that she refused his advances and resisted to the extent of her ability. Gray said "the intercourse had been against Miss Rice's will in a way and that she fought but not too hard." A jury might have thought and did think that when rebuffed, Gray, inflamed by passion, used such force as was necessary to accomplish his purpose.

On this conflict of evidence and on the measure of force used by the accused to accomplish his purpose, we fol-

low the verdict of the jury and the judgment of the judge, who saw and heard the witnesses testify. There is no error in the record.

*Affirmed.*