## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

### LEROY BRADLEY, JR. v. COMMONWEALTH OF VIRGINIA.

April 25, 1955.

Record No. 4348.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

J. *Hugo Madison* and *James A. Overton,* for the plaintiff in error.

J. *Lindsay Almond, Jr., Attorney General* and *Thomas M. Miller, Assistant Attorney General,* for the Commonwealth.

SMITH, J., delivered the opinion of the court.

This writ of error brings here for review a judgment entered on the verdict of a jury finding the defendant, Leroy Bradley, Jr., guilty of rape by force against Miss Martha Lou Drewery, and sentencing him to confinement in the penitentiary for life. The grounds relied on for a reversal of the judgment are, (1) the trial court erred in admitting certain testimony, and (2) the evidence does not support the verdict. The defendant's major contention that Miss Drewery's account of the alleged rape is inherently incredible requires that the evidence be stated in some detail.

The prosecutrix, a 34 year old white woman employed by Allen's Hardware on Washington street in Suffolk, testified that at about 2:25 p. m. on January 23, 1954 she called Smith's Grocery Store, located on the corner of Brook avenue and Wellons street, and inquired whether they had fruit cake mix. When informed by the cashier that they had it, the prosecutrix said she would be "right over to get some." It was snowing at the time, the streets were icy and slippery; few people were on the streets, and business at the Hardware was "awfully dull" with only a few customers coming in all day. At about 2:30 p. m. Miss

Drewery borrowed a dollar from Mrs. Bradshaw, the bookkeeper at the Hardware, and told her that she was going out and would be back in twenty or thirty minutes. She left the Hardware with the intention of walking to Smith's Grocery Store, a distance of about one mile. She was dressed for the wintry weather, wearing gloves, a scarf on her head, a heavy topcoat and knee boots.

As she proceeded south along the left side of Saratoga street by a ball park, an undisclosed distance from Allen's Hardware, the prosecutrix overtook a colored man whom she did not know and had never seen before, but who she later learned was the defendant. At that time there were no other pedestrians nor any vehicles traveling along the street. She testified that when she undertook to pass between the defendant and the ball park fence, where the snow was not deep, "he grabbed me by my right arm, and for a second or two I was speechless. When I came to my senses I asked him to turn me loose. I pulled against him, and he told me I was going with him. I told him I did not want to go. He said, 'You are going whether you want to or not.'" The defendant then dragged her a distance of 286 feet across the street and a vacant lot to a shed, where peanut hulls were stored. When asked what she meant by "dragged", she said: "I was partly crawling and partly walking part of the time, and I dropped down on my knees and he would take me by the arm and snatch me up. Then I stumbled over something else and he would give me a snatch."

While crossing the lot a car passed and Miss Drewery waved her hand and screamed for help, but the defendant put his hand over her mouth and grabbed her throat and told her to keep quiet if she wanted to live. She further testified that upon entering the shed he "dragged me around to the back of this pile of hulls, and he held me by one arm and he took the other arm, and dug a cave in the peanut hulls. When he got the cave fixed he asked me to take my skirt off. I told him I wasn't. So he shoved me down on

the hulls and straddled me. * * * He pulled my pants to one side and penetrated me. After he penetrated me once he straddled—he sat on my chest and held me by the throat and forced me to take his organ in my mouth. After he did that he straddled me again and penetrated me again, which seemed to me like it lasted for hours." She also testified that during the attack her face was below the rim of peanut hulls and that she was so weak and scared she could not resist and had to save what little strength she had left to keep the peanut hulls from smothering her.

After accomplishing his purpose the defendant led her from the shed to a house at 421 Wellons street, a distance of approximately 650 feet, in which there were several colored men and one colored woman. Miss Drewery testified that she was scared and wanted to talk to the colored woman, so while standing by the stove she turned to the colored woman and said, "I hope you don't mind me coming in your house to get warm, because I am about to freeze," but she did not reply. This colored woman testified that Miss Drewery had no opportunity to talk to her out of the presence of defendant. From this house the defendant led Miss Drewery to a house located on the corner of Ashley and Wellons streets, about 550 feet from the first house, and where there were many colored people. After remaining in this house a few minutes the defendant took her about 350 feet to a third house located on the corner of Nevada and Wellons streets where there were also several colored people. While there a man called the defendant into another room out of her presence for a few minutes. When asked why she did not attempt to escape or make some outcry at that time, she said: "Because I knew he had again taken me where he had friends, and I was afraid to say anything to his friends because I was afraid that they, too, might hurt me; that if I tried to break for the door, they would be all around me. I was surrounded. Two of the colored women were talking. One said to the other, 'Isn't she white?' The other said, 'I think she is.' So I spoke up

and I said, 'Yes, I am white, and I am just as much out of place as you think I am.' * * * I told them I was a Suffolk girl and that my name was Martha Drewery and I worked for R. R. Allen."

Upon being asked to leave this house the defendant and the prosecutrix returned to the house on the corner of Wellons and Ashley streets, where he put money in a "nickelodeon" and attempted to force her to dance with him. While there the prosecutrix asked a white man, Gaskin Ellis, if he had a car, and when he said no, she did not say any more because she did not know him or his business there. Miss Drewery then gave a colored woman a dollar to help her escape from the defendant and when this woman failed to assist her, she secured the aid of another colored woman who went with her to the door and pointed out the bus stop, to which she proceeded. The defendant followed her and undertook to take her back to the house but turned her loose when he saw the bus, which she boarded and returned to Allen's Hardware.

Mrs. Bradshaw testified that Miss Drewery returned to the Hardware at about 5:00 p. m.; that when she came in she was nervous and crying, fell on her shoulder and told her what had taken place. She further testified that Miss Drewery's coat was wet and muddy all over the back and that she saw peanut hulls in her hair and clothes and that her boots were wet inside. This witness also testified that Miss Drewery's reputation for honesty, truth and veracity was good.

Mrs. Bradshaw promptly called Investigator Churn, a police officer of Suffolk for thirty years, who came in a few minutes. He testified that upon his arrival he found Miss Drewery crying and highly excited; that her clothing was wet to her waist and she had peanut hulls in her hair and in her clothes; that she complained of having been raped by a colored man whom she described as to height, build and clothing. Thereafter she went with Inspector Churn over the course she and the defendant had traveled and pointed

out the three houses which they had entered. When the defendant was found Miss Drewery identified him as her assailant and later that night at Police Headquarters, in the presence of Inspector Churn and Chief Butler, she accused him of criminally attacking her.

Inspector Churn also testified that during his investigation he followed footsteps in the snow from Saratoga street to the shed, and observed impressions in the snow near the shed which indicated that someone had been down on their knees; that when he found the defendant he was wearing clothes similar to those Miss Drewery had described; that he had peanut hulls in his clothes, galoshes and shoes and that at no time during his conversations with the defendant did he claim he knew or had ever seen Miss Drewery.

Dr. Thomas Christie testified that he examined Miss Drewery at 7:30 p. m. on January 23, 1954 and found male sperm in her vagina; that she was disheveled and nervous, and had peanut dust from head to toe; that she complained of pain in her wrist and had a bruise mark about one inch long on her right arm; that she was wearing a pad and told him it was the last day of her menstruation.

In a signed statement taken by Inspector Churn on January 27, 1954, the defendant stated that the accusation of Miss Drewery made on January 23rd at Police Headquarters was not true; that he met her on the east side of the ball park on Saratoga street after 2:00 p. m. on January 23, 1954; that she was looking for a man named "Country" Ellis and he offered to help her find him; that while going along the path from Saratoga street to Wellons street she went to the hull house and stayed inside a few minutes; that she came back to the door and asked him to help her find one of her green gloves, which he did, but he did not do anything to her; that after they visited the three houses mentioned in the testimony of Miss Drewery, she told him that if he saw "Country" Ellis to tell him she would be back after 6:00 p. m., and she left between 4:00 and 5:00 p. m. on the bus from Ashley and Wellons streets.

However, when the defendant took the stand in his own behalf he abandoned the position taken in his signed statement, and testified that while in Allen's Hardware on the morning of January 23, 1954, the prosecutrix agreed to meet him that afternoon, which she did, and voluntarily had sexual intercourse with him at the shed; that they had been together several times before and had previously engaged in sexual intercourse. He also testified that he first met Miss Drewery on December 26, 1953, Saturday night after Christmas. On that occasion he said she and two white men drove to Saratoga street looking for whiskey and she became separated from them and stayed with him until about 1:00 a. m.

Several colored persons testified on behalf of the defendant to the effect that when they saw Miss Drewery and the defendant together on January 23, 1954, there was nothing out of the ordinary in her appearance, clothing or manner; that she and defendant danced together in one of the houses and that he was not holding her in either of the houses or on the street.

The defendant called Gaskin Ellis, a white man known as "Country" Ellis, who testified that on January 23, 1954 he was at Henry Newsome's house on Wellons street for two or three minutes searching for a man; that while he was there a white woman he had never seen before, but whom he identified at the trial as Miss Drewery, tapped him on the shoulder and asked if he had a car and that when he told her he did not, she left his presence.

In rebuttal, Clayton C. Mason, a salesman at Allen's Hardware, testified that he worked at the Hardware all day January 23, 1954; that he did not see the defendant in the store that day. Nell Drewery, sister of the prosecutrix, testified in rebuttal that her sister came home to Black Creek in Southampton county on Thursday, December 24, 1953, and stayed until Sunday night, the 27th, and that she and the prosecutrix were together all night, Saturday, the 26th, having slept together that night.

■ J. F. Culpepper, sheriff of Nansemond county for sixteen years, and Inspector Churn testified in rebuttal that for a number of years they had known Sam Nichols, a defense witness whose testimony was in conflict with that of Miss Drewery; that they knew his reputation for truth and veracity and that it was bad. On cross examination they stated that their testimony was based primarily on what they had heard from fellow officers. No objection was made that these witnesses were not asked Nichols' "general" reputation. The defendant contends, however, that these officers were not competent to testify as to the reputation of Nichols, because "they had no opportunity to know the reputation of Sam Nichols and had not discussed or heard his reputation discussed with his associates." There is no merit in this contention.

One of the universally recognized methods of impeaching a witness is to show his bad general reputation for truth and veracity in the community where he lives, or among his neighbors and acquaintances, by witnesses who know that reputation. *Brotherhood of R. T.* v. *Vickers,* 121 Va. 311, 93 S. E. 577; Law of Ev., Va. and W. Va., § 105; p. 188; 58 Am. Jur., Witnesses, § 725, p. 391; 20 Michie's Jur., Witnesses, § 67, p. 524. The proper mode of examining the witness called to impeach another who has testified in the case, is to inquire whether he knows the *general reputation* of the person in question among his neighbors and acquaintances; and when this question is answered in the affirmative he may state whether that reputation is good or bad. *Davis* v. *Franke,* 33 Gratt. (74 Va.) 413, 427; *Langhorne* v. *Commonwealth,* 76 Va. 1012; 4 Minor's Institutes, at page 861.

The evidence of the impeaching witness must be confined to the general reputation of the witness for truth and veracity and he may not testify as to the commission of specific acts of untruthfulness or other bad conduct, though these have bearing on veracity. *Fenner* v. *Commonwealth,* 152 Va. 1014, 148 S. E. 821; *Allen* v. *Commonwealth,* 122 Va. 834, 94 S. E. 783. Whether the impeaching witness in

fact knows the general reputation of the person in question is generally determined by questioning him on cross examination as to the sources and content of the information on which he bases his assertion that the reputation is bad. The extent of the cross examination and the number of witnesses permitted to testify as to general reputation are matters largely in the sound discretion of the trial judge. *Zirkle* v. *Commonwealth*, 189 Va. 862, 55 S. E. (2d) 24; *Kanter* v. *Commonwealth*, 171 Va. 524, 199 S. E. 477; *Michelson* v. *United States*, 335 U. S. 469, 69 S. Ct. 213, 93 L. Ed. 168; Greenleaf on Evidence (16th ed.), p. 588.

It is the province of the jury to determine what degree of credit ought to be given the evidence but it is for the court alone to determine whether the witness is competent and whether the evidence is admissible. *Mullins* v. *Commonwealth*, 113 Va. 787, 75 S. E. 193; 7 Michie's Jur., Evidence, § 50, p. 87. A witness is competent to testify as to the general reputation of another who has testified in the case when he testifies that he knows that reputation, which is what the people in the community generally believe. *Zirkle* v. *Commonwealth, supra;* Greenleaf on Evidence (16th ed.), p. 586. Hence, if the impeaching witness is otherwise competent, the fact that he is not a personal associate of the person in question; that he is a police officer or that he had previously testified in the case are matters for the jury to consider in determining the degree of credit to be given his testimony.

 The principal question presented by the defendant is whether his conviction of rape by force is contrary to the law and the evidence. He admits having sexual intercourse with the prosecutrix but denies that this act was by force and against her will. He contends that there is no evidence of her "struggling to resist" and that her version of what happened is contrary to human experience and inherently incredible. In this respect he says it is inconceivable that she would remain in his company approximately two and one half hours after the alleged rape without making some

outcry or giving some indication that she was being restrained against her will, especially when she had opportunity to do so on the street and in the houses to which they went.

Where the female is sixteen years of age or more and not under mental or physical disability as defined in the statute, unlawful carnal knowledge of her by force and against her will constitutes the crime of rape. Code, § 18-54. To sustain the charge there must be evidence of "some array or show of force in form sufficient to overcome resistance, but the woman is not required to resist to the utmost of her physical strength, if she reasonably believes resistance would be useless and result in serious bodily injury to her. *Jordan* v. *Commonwealth*, 169 Va. 898, 194 S. E. 719, and cases cited." *Davis* v. *Commonwealth*, 186 Va. 936, 946, 45 S. E. (2d) 167, 171. The amount of resistance required necessarily depends on the circumstances, such as the relative physical condition of the parties and the degree of force manifested. *Davis* v. *Commonwealth, supra; Gray* v. *Commonwealth*, 184 Va. 236, 35 S. E. (2d) 65.

If the evidence of the Commonwealth is credible and from it the guilt of the accused is believed by the jury beyond a reasonable doubt, it is sufficient to sustain a conviction of rape, and this is true even though the evidence consists only of the uncorroborated testimony of the prosecutrix. But if the evidence is "inherently incredible or so contrary to human experience or to usual human behavior as to render it unworthy of belief," *it is* not sufficient to warrant a verdict of guilty beyond a reasonable doubt. *Young* v. *Commonwealth*, 185 Va. 1032, 1033, 40 S. E. (2d) 805; *Legions* v. *Commonwealth*, 181 Va. 89, 23 S. E. (2d) 764; *Addington* v. *Commonwealth*, 161 Va. 975, 170 S. E. 565.

In the instant case the jury saw and heard the witnesses testify and by its verdict resolved the conflicts in the evidence against the defendant, and the verdict was approved by the judgment of the learned trial judge. Hence, our examination of the evidence is confined to inquiring whether the

jury was warranted, as reasonable men, in finding the accused guilty under the applicable rules of law and not what action we might have taken as members of the jury. In testing the credibility and weight to be ascribed to the evidence, we must give trial courts and juries the wide discretion to which a living record, as distinguished from a printed record, logically entitles them. The living record contains many guideposts to the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them.

On a very cold snowy day the prosecutrix, weighing 118 pounds and dressed in heavy clothes, was suddenly grabbed by the defendant, a man weighing 172 pounds, as she undertook to walk past him on a street where no one else was present or nearby. She had never seen him before. When she screamed he threatened to kill her, put his hand over her mouth and forced her to go with him to a lonely shed where he by force and against her will compelled her not only to submit to two acts of sexual intercourse but also to other loathsome abuse.

Although the prosecutrix was absent from her place of employment for approximately two and one half hours, the evidence does not show the exact time of the attack or the amount of time she remained with the defendant thereafter. She said the attack seemed to her "like it lasted for hours." The streets were icy and travel was slow. Whatever was the lapse of time between the offense and the complaint of the prosecutrix, which was clearly less than two and one half hours, she was under the physical control of the defendant, among strangers and there was no one in whom she could confide. She reported the assault and described her assailant as soon as she found friends. At that time she was crying and highly nervous, her clothes were wet to the waist and she was covered with dirt and peanut hulls.

In addition, the testimony of the prosecutrix was corroborated by several witnesses. The cashier at Smith's

Grocery Store testified that she received a telephone inquiry such as that described by the prosecutrix but that no one came to buy fruit cake mix that afternoon. Mrs. Bradshaw and Inspector Churn described the pitiful condition of the prosecutrix when she returned to the Hardware. The physician's testimony also corroborated that of the prosecutrix in material respects.

On the other hand the defendant gave two conflicting explanations of what occurred between him and the prosecutrix. In his signed statement he specifically denied sexual intercourse with the prosecutrix, while in his testimony he admitted sexual relations with her on January 23, 1954, but claimed that such relations were the result of a previous arrangement and that they had previously engaged in sexual intercourse. Moreover, for the purpose of impeaching defendant's credibility the Commonwealth showed that he had been convicted of a felony; that he was not in the Hardware on the morning of January 23, 1954 when he said the prosecutrix agreed to meet him, and that on December 26, 1953, the day he claimed to have first met the prosecutrix, she was not in Suffolk but was at her home in Southampton county. Furthermore, the white man the defendant said Miss Drewery was looking for testified that he had never seen her before the time she asked him at one of the houses whether he had a car.

In evaluating the evidence in the light of defendant's insistence that the acts and conduct of the prosecutrix were contrary to human experience and that her testimony was inherently incredible, the jury properly took into account the fact that she was dragged through snow and water, twice ravished, foully abused, her life threatened and then taken to unfriendly surroundings and among friends of the defendant. It was the function of the jury to say what was a reasonable reaction of a woman under such circumstances and conditions, and whether her acts and conduct were reasonable or contrary to human experience. Her prompt report when she reached friends, her physical and mental

condition at the time, and the corroboration of much of her testimony warranted the jury in accepting her evidence and returning a verdict of guilty.

For the reasons stated, we find no error in the record and therefore the judgment of the trial court is affirmed.

*Affirmed.*

HUDGINS, C. J., and EGGLESTON, J., dissenting.

EGGLESTON, J., dissenting.

The majority opinion sustains the conviction of the accused, a Negro, of rape of a white woman thirty-four years of age. His punishment was fixed at life imprisonment, but it might have been death. Code, § 18-54. The conviction is based primarily upon the testimony of the prosecutrix which to my mind is contrary to human experience and insufficient to show the guilt of the accused beyond a reasonable doubt.

According to the prosecutrix, her desire to purchase a certain kind of "fruitcake mix" prompted her to go in the early afternoon to a grocery store "about one mile away," which incidently required her to pass through that part of the city of Suffolk which is inhabited by Negroes. While on this mission, she says, she was accosted on the street by the accused, in open daylight, and forced to go into a shed where she was raped by force and against her will.

The evidence shows without contradiction that for the next two and one-half hours the prosecutrix remained with the accused, walked along the streets of the city with him, passed numerous persons both white and colored, and visited with the accused three different places. In one of these places she talked to a white man out of the presence of the accused. And yet all the while she made no outcry or complaint of the terrible crime which had been perpetrated upon her, no appeal for help, and gave no indication whatsoever that she was, as she says, being held or restrained

by the accused. Such conduct on her part was contrary to what we know from common sense and experience is that of a woman who had been thus outraged. Moreover, it is incredible that the accused, after having committed such a crime, would have walked the streets of the city in broad daylight with the prosecutrix and in company with her would have visited several places where he was known. He would certainly know that she would tell of his conduct and her plight at the first opportunity.

The testimony of the accused that the prosecutrix voluntarily submitted to him on this occasion, as she had previously done, may not be true. Indeed, it may have been so shocking to the jury as to have induced the verdict of conviction. We are not required to speculate as to what really occurred between the prosecutrix and the accused. The Commonwealth's case must stand or fall on the testimony of the prosecutrix, and that I think is too fantastic and improbable to sustain a finding of guilt beyond a reasonable doubt.

In *Legions* v. *Commonwealth*, 181 Va. 89, 23 S. E. (2d) 764, we reversed a judgment of conviction and sentence of death imposed upon a Negro for the rape of a white woman based upon a similarly incredible story of the prosecutrix. In my opinion, what we said in that case applies here: "Of course we are mindful of the force of a jury's verdict, approved by the trial court, but we have said time and again that we are not required to believe that which we know from human experience is inherently incredible. 'What we know as men we are not required to forget as judges.'" (181 Va., at page 92, 23 S. E. (2d), at page 765.) See also, *Terry* v. *Commonwealth*, 174 Va. 507, 6 S. E. (2d) 673; *Vance* v. *Commonwealth*, 155 Va. 1028, 154 S. E. 512.

I would set aside the verdict of the jury, reverse the judgment of conviction, and remand the case for a new trial if the Commonwealth be so advised.

HUDGINS, C. J., concurs in this dissent.