COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Chief Judge Decker, Judges Humphreys and Russell
Argued at Leesburg, Virginia


MARTIN WARNER, JR.

v.      Record No. 0871-18-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE WESLEY G. RUSSELL, JR.
NOVEMBER 26, 2019


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
John M. Tran, Judge[1]

Harold N. Ward, Jr. (The Ward Law Office, P.C., on briefs), for
appellant.

Lauren C. Campbell, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Martin Warner, Jr., appellant, was convicted by a jury of three counts of felony possession

of a controlled substance in violation of Code § 18.2-250 and misdemeanor possession of a

controlled substance in violation of Code § 18.2-250.1. On appeal, appellant argues the trial court

erred in denying his motion to suppress evidence recovered as a result of an unlawful traffic stop.

Appellant also contends the trial court erred in admitting Commonwealth's Exhibits 2 through 7,

claiming the Commonwealth did not establish all vital links in the chain of custody. For the reasons

stated, we affirm.

BACKGROUND

On August 12, 2016, Officer Tyler Timberlake with the Fairfax County Police Department

stopped appellant for a motor vehicle violation. When Timberlake reached the vehicle, he smelled

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The Honorable Robert J. Smith presided over the motion to suppress.

the odor of marijuana coming from the vehicle. He obtained appellant's license and registration and ordered appellant out of the vehicle. Appellant refused and, after a short interval, "took off at a high rate of speed[.]" Timberlake and his partner pursued appellant and were able to stop his vehicle utilizing a PIT maneuver.[2] Timberlake's squad car was totaled as a result of the chase and PIT maneuver. As a result of the encounter, appellant was arrested for felony eluding.[3]

Slightly more than a month later, on September 22, 2016, Fairfax Officer Bradley Chiz was driving in an unmarked car with Timberlake. They were observing traffic exiting off of Interstate 95. The officers observed a red van traveling on the exit ramp, and Timberlake recognized the license plate as belonging to appellant. For the sake of accuracy, Timberlake ran the license plate number through DMV and confirmed that it was appellant's van. At that point, Chiz followed the van. The officers testified that they observed the van cross over the solid white lane marker that separates the turn lane from the "straight-through" lane and then pull back into the lane abruptly in front of another vehicle without using a turn signal. According to testimony, appellant's abrupt lane change caused the other vehicle to brake suddenly. Chiz then observed appellant's van "drift" over the dotted white lane marker before correcting back into his lane.

Suspecting that the driver was intoxicated, Chiz activated the lights and siren on his police vehicle and initiated a traffic stop. The van pulled into a parking lot and stopped. As Chiz approached the vehicle, he noticed a "very heavy odor of air freshener coming out of the window." Chiz testified that, in his experience, individuals use air fresheners to cover up scents associated with the presence of illegal drugs. Appellant produced his license and registration, and Chiz asked him to step out of the van. In his interactions with appellant, Chiz was observing "whether or not

---

[2] A PIT maneuver is a pursuit tactic in which a pursuing car strikes the rear quarter panel of the car being pursued in an effort to turn it sideways, thereby causing the fleeing driver to lose control and stop.

[3] That offense is not a subject of this appeal.

there was any slurred speech, again going back to the possible DWI aspect from the driving behavior." Chiz did not detect any signs of DWI and returned to his cruiser while Timberlake spoke with appellant. During cross-examination, Chiz confirmed that appellant had told him that appellant had committed the sudden lane change in order to avoid a car accident.[4]

While Chiz was at the cruiser, Timberlake communicated to him via radio that he noticed the odor of marijuana coming from the opened driver's door. Timberlake later testified that the odor was unburnt marijuana. As a result of his olfactory observation, Timberlake searched the van and located a grinder in the center console and individual bags of marijuana underneath the driver's seat.

On cross-examination, Timberlake testified that he recognized appellant as the individual he had stopped a month earlier, and appellant's driver's license and vehicle tags came back from DMV as valid.[5] When asked by counsel if he "began following [appellant] just because you recognized him as someone you had arrested several weeks earlier?", Timberlake responded, "Yes, sir, it was a pretextual stop." Again, when asked if Timberlake followed appellant because he was someone he previously had arrested, Timberlake answered, "Yes, sir."

Appellant moved to suppress the evidence recovered from the search of his van. In addition to the testimony summarized above, a copy of the video recorded by the on-board camera on Chiz's police cruiser was admitted into evidence. According to Chiz, if working properly, the on-board camera records video while the cruiser is in operation. Once the cruiser's lights and siren are activated, the on-board camera system preserves what was captured on the video thirty seconds

---

[4] Specifically, appellant's counsel asked Chiz whether appellant "told you that somebody had cut him off and he had to quickly adjust to avoid a collision[?]", and Chiz responded, "That's what he said, yes, sir."

[5] On redirect, Timberlake verified that he did not initially run appellant's driver's license, just his vehicle tags.

prior to the activation of the lights and siren through the end of the encounter. The video here failed to show the red van make any of the unsignaled lane changes or sudden maneuvers about which the officers testified. In fact, appellant's red van is not visible in the vast majority of the video.

Appellant argued the officers lacked reasonable, articulable suspicion to conduct a traffic stop because their testimony was not supported by the on-board camera video. He argued that these inconsistencies rendered the officers' testimony unworthy of belief. Appellant also argued that the length of the stop, which lasted almost fifteen minutes, exceeded any legitimate purpose of the stop.

The Commonwealth responded that the stop was lawful because it is a moving violation for a vehicle to weave outside of its lane of travel and for a driver to change lanes in traffic without using a turn signal. In regard to the video, the Commonwealth suggested that the fact that the video did not capture appellant's erratic driving did not establish that such erratic driving did not occur.

The trial court denied the motion to suppress. In doing so, the trial court noted that it was initially skeptical of the officers' testimony given the complete absence of any corroboration on the video. The trial court, however, found that Timberlake's willingness to admit that the stop of appellant was pretextual, i.e., the officers were looking for a reason to stop him to allow a search for something unrelated to the stop, made the officers' other testimony more credible. In essence, the trial court found that, if Timberlake were going to lie during his testimony, he would have lied about the stop being pretextual. The trial court summarized its conclusion by stating, "[Y]ou take out that statement about it being a pretext, I grant the motion but since it's there, the credibility shoots sky high, so I deny the motion."

The matter proceeded to trial. During trial, Timberlake testified that he recovered from appellant's van whole, multi-colored pills that he believed to be methamphetamine. He also recovered other packages that he believed contained drugs. Timberlake stated that he did not

package the suspected drugs, but placed them in the locked police cruiser.[6]  Upon returning to the station, Timberlake unlocked the police car, retrieved the suspected drugs, and delivered them to Officer Arnold Endl.  Endl packaged them in plastic evidence bags, sealed them with tape, initialed the tape, and filled out a state laboratory sheet.  (Exhibit 6).  At trial, Endl was shown and identified Exhibits 2 through 5, the substances at issue, and indicated that he did not alter or tamper with the evidence in any way.  After Endl packaged the evidence, he gave it back to Timberlake.

In October of 2016, Raul Rankin, an evidence technician, traveled to the Mount Vernon Police Station and retrieved Exhibits 2 through 5.  He stored them in a secured evidence locker within the property evidence room at the Fairfax police department.  He did not tamper with or alter the evidence in any way.  Officer Garrett Polowy, a narcotics control officer, transported the items to the Virginia Department of Forensic Science Northern Lab in Manassas.  Polowy delivered the items to receiving technician Stephen Delfino, who took control of them.

Kelly Janocka, a forensic scientist at the Department of Forensic Science in Richmond, qualified as an expert in the area of chemical analysis of narcotics.  She testified that she personally received four evidence bags, Exhibits 2 through 5, on December 30, 2016, from an evidence technician in the Richmond evidence vault.  Each bag contained a unique forensic science laboratory number and her initials.  At trial, Janocka identified each exhibit and testified that the drugs she identified appeared in the same condition as when she first received them

_____

[6] Chiz testified that at the scene of the traffic stop, Timberlake handed the suspected drugs, which were contained in an iPhone case, to Chiz, who placed the case inside a plastic bag and locked the bag inside the cruiser while Timberlake finished his search of the van.  Chiz then transported appellant and the suspected drugs to the Mount Vernon Police Station.  Timberlake testified that *he* transported appellant to the police station and advised appellant of his Miranda rights.  According to Timberlake, appellant agreed to speak with him without an attorney.  In that conversation, appellant admitted to Timberlake to possessing "Molly rocks" and "marijuana, cocaine, and MDMA" in his van.

except for Commonwealth's Exhibit 4, which were now crumbled pills that she had to break into smaller pieces in order to test them.

Janocka testified regarding her analysis of the substances. She stated that Commonwealth's Exhibit 2 was dibutylone, a Schedule I controlled substance, that Commonwealth's Exhibit 3 was five smaller bags all containing cocaine, a Schedule II controlled substance, that Commonwealth's Exhibit 4 consisted of tablets that contained methamphetamine, a Schedule II controlled substance, and that Commonwealth's Exhibit 5 was marijuana. Janocka further testified that Commonwealth's Exhibit 7 was the certificate of analysis that she prepared, with her signature, accurately documenting her testing of the referenced items.

Appellant objected to the admission of Commonwealth's Exhibits 2, 3, 4, 5, 6, and 7 based on the Commonwealth's failure to prove the chain of custody. Specifically, appellant argued that there was no evidence about how the narcotics were transported from the Manassas lab to the Richmond lab where Janocka tested the evidence.

The trial court initially overruled the objection, but stated that it had some criticism of the manner in which the chain of custody was proven in this case. The trial court noted that it found Janocka's testimony very credible and "matter of fact" and found that it tied up all the "lo[o]se ends." Nevertheless, the trial court indicated it would spend the evening looking at caselaw and revisit the motion in the morning. The next day, the trial court recited its final ruling on the matter:

> I have every confidence in the world that these are the same drugs. By the consideration of testimony of the witness, Officer Timberlake, and the chemist, as well as [what is] apparent on the packaging themselves.
>
> I found that the evidence clearly shows that there is a reasonable certainty there has been no alteration, or substitution of the substance[s] found in Mr. Warner's car.

At the conclusion of the trial, the jury convicted appellant of the drug offenses that are the subject of this appeal. In his appeal, appellant argues that the trial court erred in denying his motion to suppress and in finding the evidence of the chain of custody was sufficient to allow Exhibits 2 through 7 to be admitted in evidence.

## ANALYSIS

### I. Trial court's ruling on the motion to suppress

"On review of the denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth[,]" the prevailing party below. Adams v. Commonwealth, 48 Va. App. 737, 741 (2006). An appellate court "should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Reittinger v. Commonwealth, 260 Va. 232, 236 (2000) (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)). Accordingly, although "whether the officers' conduct violated the Fourth Amendment triggers *de novo* scrutiny on appeal, we defer to the trial court's findings of 'historical fact[.]'" Barkley v. Commonwealth, 39 Va. App. 682, 689-90 (2003) (quoting Davis v. Commonwealth, 37 Va. App. 421, 429 (2002)).

Appellant acknowledges that Timberlake's admission that the stop of appellant was based on a pretext does not render the stop and search invalid. As the United States Supreme Court has made clear, an officer's subjective motivation for a traffic stop, including pretextual stops, is irrelevant to the Fourth Amendment analysis so long as, objectively viewed, there is sufficient probable cause or reasonable, articulable suspicion to justify the stop. See Whren v. United States, 517 U.S. 806, 813 (1996) (holding that the relevant "cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause

- 7 -

Fourth Amendment analysis").[7]  Accordingly, appellant challenges whether such an objective basis existed and whether the stop was impermissibly elongated to allow for the ultimate discovery of the contraband.

### A.  Justification for the traffic stop

There is no dispute that, if the officers witnessed appellant commit a traffic infraction (or what they reasonably believed to be a traffic infraction), they possessed sufficient cause for the traffic stop.  Similarly, it is undisputed that, if appellant drove his van in the manner described by the officers in their testimony, appellant committed such a traffic infraction.  Accordingly, if the factfinder concluded that the officers were telling the truth about appellant's driving, there was sufficient cause for the stop, and thus, the stop did not violate the Fourth Amendment.

The record is clear that the trial court, sitting as factfinder on the motion to suppress, credited the officers' testimony regarding appellant's driving; thus, appellant's challenge is a challenge to the trial court's credibility finding regarding the officers.

"Determining the credibility of witnesses . . . is within the exclusive province of the [factfinder], which has the unique opportunity to observe the demeanor of the witnesses as they testify."  Dalton v. Commonwealth, 64 Va. App. 512, 525 (2015) (ellipsis in original) (quoting Lea v. Commonwealth, 16 Va. App. 300, 304 (1993)).  Therefore, this Court will not disturb the factfinder's determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."  Walker v. Commonwealth, 258 Va. 54, 70-71 (1999).  "Indeed, '[t]he living record contains many guideposts to the truth which are not in the printed record,' and an appellate court, not having the benefit of these guideposts, 'should give great

---

[7] Although the rule of Whren does not render an otherwise valid stop invalid because of an officer's subjective motivation, it should not be read, as Timberlake appears to have done, as an endorsement of pretextual stops.

weight to the conclusions of those who have seen and heard them.'" Dalton, 64 Va. App. at 526 (alteration in original) (quoting Bradley v. Commonwealth, 196 Va. 1126, 1136 (1955)).

Appellant argues that, given the evidence, the trial court could not have concluded that the officers saw what they claimed to have seen. Specifically, he notes that none of the erratic driving behavior described by the officers can be seen on the video recording from the on-board camera in Chiz's cruiser.

We acknowledge that nothing described by the officers can be seen on the video. Although the absence of such video evidence should be considered by a factfinder and could lead a reasonable factfinder to conclude that the events testified to by the officers did not occur, it is not dispositive. Any number of factors ranging from camera angle, system malfunction, some minor error in Chiz's testimony about when he activated the lights and siren that should have begun the process of saving the recorded video, and potentially others could explain why the video does not capture erratic driving by appellant.[8] Accordingly, the absence on the video of the events described was but one data point for the factfinder to consider and did not establish that the officers' version of appellant's driving was untruthful.

Particularly galling to appellant is that the trial court acknowledged that the absence of evidence of erratic driving on the video raised significant credibility questions regarding the officers' testimony. The trial court acknowledged that it would have found their testimony unbelievable but for Timberlake admitting that the stop of appellant was pretextual, based on his prior encounter with appellant and a hope to find evidence of crimes other than a mere traffic infraction. In short, the trial court concluded that if Timberlake were going to lie during his

---

[8] Obviously, appellant posits that the absence of such video is explained by the fact that he never drove his van in the manner described. However, viewing the evidence in the light most favorable to the Commonwealth, see Adams, 48 Va. App. at 741, we must reject this possibility because it was rejected by the factfinder.

sworn testimony, he would have lied about conducting a pretextual stop. Thus, according to the trial court's logic, Timberlake must have been telling the truth about appellant's driving.

Appellant argues that such reasoning requires reversal; however, he cites no support for this argument. Ultimately, the trial court, as factfinder, considered all of the evidence, and, despite its initial misgivings about the officers' testimony, ultimately credited the officers' version of appellant's driving behavior.

Although the testimony is disputed by appellant, there is nothing inherently incredible in the officers' testimony. Accordingly, we are bound by the trial court's credibility finding because "[w]hen the law says that it is for the trier of fact to judge the credibility of a witness, the issue is not a matter of degree." Dalton, 64 Va. App. at 526 (alteration in original) (quoting Simpson v. Commonwealth, 199 Va. 549, 557 (1957)). Thus, even though another factfinder could have weighed the evidence differently, concluding that the video evidence demonstrated that appellant did not drive in the manner described and that Timberlake's admission to engaging in a pretextual stop damaged rather than enhanced his credibility as a testifying officer, we are bound by the trial court's determination on appeal.

Accepting that appellant drove in the manner described by the officers, it is clear that appellant committed at least one traffic offense in their presence. Thus, the officers possessed sufficient cause to stop appellant, and the stop did not violate the Fourth Amendment. Accordingly, given its factual findings, the trial court did not err in denying the motion to suppress.

### B. Alleged elongation of the stop

Although he cites no law to support his position in his opening brief, appellant argues that the stop of his vehicle for the alleged traffic infraction was impermissibly elongated in violation of the Fourth Amendment.

The question of whether a traffic stop has been impermissibly elongated to investigate other potential crimes is governed by Rodriguez v. United States, 135 S. Ct. 1609 (2015). In Rodriguez, the United States Supreme Court explained that, consistent with the Fourth Amendment, a "seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." Id. at 1612 (alteration in original) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). Although the length of the stop obviously includes the decision of the officer "whether to issue a traffic ticket," it also permissibly includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 1615. Only if an officer learns of new information that gives him "the reasonable suspicion ordinarily demanded to justify detaining an individual[,]" id., may the officer extend the stop to investigate other criminal activity.

Given the trial court's ultimate acceptance of the officers' testimony, the length of the stop here does not run afoul of either Rodriguez or the Fourth Amendment. Upon arriving at appellant's window to request his driver's license and conduct his investigation regarding a possibly DWI charge, Chiz smelled air freshener, which, in his experience often was used to attempt to mask the smell of illegal drugs. Then, when Chiz returned to his cruiser to conduct the type of license and warrant checks expressly approved of in Rodriguez, Timberlake detected the smell of unburnt marijuana. This gave him probable cause independent of the traffic stop to detain appellant and search both appellant and his van for marijuana. See Bunch v. Commonwealth, 51 Va. App. 491, 496 (2008) (adopting the plain smell doctrine and concluding that an officer who smells marijuana has probable cause to seize and search). Accordingly, assuming appellant was detained longer than necessary to complete the incidents of the traffic

stop, the officers had independent probable cause to investigate the potential possession of marijuana, and thus, did not violate the Fourth Amendment.

Accordingly, the length of the stop did not violate the Fourth Amendment, and the trial court did not err in denying the motion to suppress.

## II.  Trial court's admission of Exhibits 2 through 7

On chain of custody grounds, appellant challenges the admission into evidence of six exhibits related to the drugs recovered from his van and the chemical analysis of those drugs. Questions regarding the admissibility of the evidence are reviewed under an abuse of discretion standard.  Atkins v. Commonwealth, 68 Va. App. 1, 7 (2017).  "An abuse of discretion occurs only when reasonable jurists could not differ as to the proper decision."  Reston Hosp. Ctr., LLC v. Remley, 63 Va. App. 755, 764 (2014) (internal quotation marks omitted) (quoting Brandau v. Brandau, 52 Va. App. 632, 641 (2008)).  The abuse of discretion standard "necessarily implies that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts—yet still remain entirely reasonable."  Hamad v. Hamad, 61 Va. App. 593, 607 (2013).

The rule governing chain of custody requires "a showing with reasonable certainty that the item [has] not been altered, substituted, or contaminated prior to analysis, in any way that would affect the results of the analysis."  Reedy v. Commonwealth, 9 Va. App. 386, 387 (1990) (alteration in original) (quoting Washington v. Commonwealth, 228 Va. 535, 550 (1984)).  The Commonwealth needs only to "establish . . . the vital links in the chain of custody.  Other gaps in the chain go to the weight of the evidence rather than its admissibility."  Branham v. Commonwealth, 283 Va. 273, 282 (2012).  The evidentiary burden the Commonwealth must meet in making the requisite showing is the preponderance of the evidence standard.  Atkins, 68 Va. App. at 9 (recognizing that "factual questions underlying the admissibility of evidence" need

only be proved "by a preponderance of the evidence" (quoting Bloom v. Commonwealth, 262 Va. 814, 821 (2001))). "Where there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence." Brown v. Commonwealth, 21 Va. App. 552, 556 (1996) (quoting Reedy, 9 Va. App. at 391).

Thus, to prevail in his chain of custody argument, appellant must demonstrate that no reasonable factfinder could have concluded that the Commonwealth established that the drugs analyzed by Janocka were the same drugs recovered from his van. On this record, he cannot do so.

The record reflects that the trial court thoroughly reviewed the pertinent evidence and gave every consideration to appellant's objection. Based on the witnesses it found to be credible, most importantly Janocka, and the assurance provided by the evidence being in signed and sealed evidence bags at the critical points in the chain, the trial court reasonably concluded that the Commonwealth had made the necessary showing for the challenged exhibits to be admitted into evidence. Because such a conclusion falls well within the "bell-shaped curve of reasonability[,]" Hamad, 61 Va. App. at 607, that is the essence of the abuse of discretion standard, the trial court did not err in admitting Exhibits 2 through 7 into evidence.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

- 13 -